[No. S101183. May 19, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
TRACY L. BATTS et al., Defendants and Appellants.

## Counsel

Chris R. Redburn, under appointment by the Supreme Court, for Defendant and Appellant Tracy L. Batts.

Barbara A. Smith, under appointment by the Supreme Court, for Defendant and Appellant Terrance McCrea.

Bill Lockyer, Attorney General, David P. Druliner and Robert R. Anderson, Chief Assistant Attorneys General, Carol Wendelin Pollack and Pamela C. Hamanaka, Assistant Attorneys General, John R. Gorey, Margaret E. Maxwell and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

Steve Cooley, District Attorney (Los Angeles), George M. Palmer, Head Deputy District Attorney, Roderick Leonard and Matthew G. Monforton, Deputy District Attorneys, as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**GEORGE, C. J.**—After an earlier joint trial on first degree murder indictments ended in mistrial as the result of the prosecution's intentional misconduct, defendants Tracy L. Batts and Terrance McCrea were retried and convicted of those same charges. The Court of Appeal reversed the convictions, holding that the trial court erred by failing to grant defendants' pretrial motions to dismiss on double jeopardy grounds, and remanding with directions to enter judgments of dismissal as to each defendant. We granted review to consider the circumstances under which a prosecutor's intentional misconduct *that results in a mistrial* precludes retrial on double jeopardy grounds under the Fifth and Fourteenth Amendments to the federal Constitution, and under article I, section 15, of the California Constitution.[1]

With regard to the *federal* constitutional double jeopardy issue, the United States Supreme Court held in *Oregon v. Kennedy* (1982) 456 U.S. 667 [102 S.Ct. 2083, 72 L.Ed.2d 416] (*Kennedy*) that under the federal double jeopardy clause a retrial is prohibited following the grant of a defendant's mistrial motion only if the prosecution committed the misconduct *with the intent to provoke a mistrial.* Applying this standard and deferring, as *Kennedy* instructs, to the factual findings of the trial court, we conclude that the prosecution in the earlier trial in this matter had no such intent, and that the Court of Appeal accordingly erred in concluding that the trial court should have granted defendants' motion to dismiss under federal double jeopardy principles.

As we shall explain, however, the standard adopted by the federal high court in *Kennedy* has been widely viewed as unduly narrow and as not fully protective of the interest that the double jeopardy clause was intended to safeguard, and in the two decades since *Kennedy* was decided a number of state courts have interpreted the double jeopardy guarantee of their own state constitutions as embodying a broader protection. Although the standards adopted in these more recent decisions vary somewhat from one another and, in our view, have their own shortcomings, we agree with the basic conclusion of these courts that instances in which a prosecutor commits misconduct with the intent to provoke a mistrial do not exhaust the circumstances in which a prosecutor's intentional misconduct improperly may defeat the interest that the double jeopardy clause is intended to safeguard.

Accordingly, with regard to the state constitutional double jeopardy issue, we conclude that when prosecutorial misconduct results in a defendant's

---

[1] In this case, we have no occasion to address the proper application of the federal or state double jeopardy clauses in the related but distinct circumstance in which prosecutorial misconduct results not in a mistrial, but rather in the reversal of a conviction on appeal.

successful motion for mistrial, the double jeopardy clause of the California Constitution bars retrial in two circumstances. First, as under the federal Constitution, retrial is barred by the state double jeopardy clause when the prosecution intentionally commits misconduct for the purpose of triggering a mistrial. Second, the state double jeopardy clause also may bar retrial when the prosecution, believing (in view of events that occurred during trial) that a defendant is likely to secure an acquittal at that trial, knowingly and intentionally commits misconduct in order to thwart such an acquittal. In the latter circumstance, however, retrial is barred under the state double jeopardy clause only if a court, reviewing all of the circumstances as of the time of the misconduct, finds not only that the prosecution believed that an acquittal was likely and committed misconduct for the purpose of thwarting such an acquittal, but also determines, from an objective perspective, that the prosecutorial misconduct deprived the defendant of a reasonable prospect of an acquittal.

In other words, we conclude that when the prosecution in a criminal case commits misconduct that results in a mistrial, the double jeopardy clause of the state Constitution bars retrial in some circumstances in which the federal Constitution, as construed in *Kennedy, supra,* 456 U.S. 667, does not. It is important to recognize, however, that although we conclude that the state double jeopardy standard is properly protective of a broader range of double jeopardy interests than the standard set forth in *Kennedy,* as a practical matter retrial is likely to be barred under the state double jeopardy standard only in exceptional circumstances, because the standard we adopt requires not only that the prosecutor subjectively believe that an acquittal was likely when he or she intentionally committed misconduct, but also that a court determine *from an objective perspective* that the misconduct *actually* deprived the defendant of the reasonable prospect of an acquittal. The state double jeopardy standard is appropriately stringent, because the normal and usually sufficient remedy for the vast majority of instances of prejudicial prosecutorial misconduct that occur at trial is provided under the federal and state *due process* clauses, and calls for either a declaration of mistrial followed by retrial, or a reversal of a defendant's conviction on appeal followed by retrial. The remedy mandated by the double jeopardy clause—an order barring retrial and leading to the dismissal of the criminal charges against the defendant without trial—is an unusual and extraordinary measure that properly should be invoked only with great caution. As we shall explain, we further conclude that, under the applicable standard, in this case retrial was not barred by the state double jeopardy clause.

Because we conclude that retrial of defendants was not barred under either the federal or state double jeopardy clause, we reverse the judgment of the

Court of Appeal, which set aside defendants' subsequent convictions on double jeopardy grounds. In light of the Court of Appeal's conclusion on the double jeopardy issue, it did not reach or resolve the additional issues raised by defendants on appeal regarding the conduct of their subsequent trial, and we shall remand the matter to the Court of Appeal to permit it to address those remaining claims.

I

This case was tried three times: in 1998 (a trial in which Batts was the sole defendant, following which a new trial was granted); in late 1999 (a joint trial of both defendants, Batts and McCrea, ending in mistrial); and finally in 2000 (again, a joint trial of both defendants). The first and third trials resulted in first degree murder convictions. Events at the second trial, which as noted ended in a mistrial, give rise to the double jeopardy claim in the present appeal from the convictions and judgment rendered in the third trial.

Brothers Benczeon Jones and Brian Jones were young members of the Atlantic Drive Crips, a criminal street gang in Compton. On September 12, 1997, Benczeon was washing his car in front of an apartment building when defendants Tracy Batts and Terrance McCrea (both older members of the Atlantic Drive Crips gang) and a third man approached him and told him to leave the area, "or something gonna happen."[2] Brian came out of his apartment and, together with Benczeon, argued with defendants, who then departed. But defendants soon returned, Batts with a gun in each hand, and McCrea with a single weapon. They fired several shots, killing Brian and wounding Benczeon in the leg.

Brian's girlfriend, Sonique Steward, from her apartment, saw Batts arrive. When she heard shots she ran outside and saw Brian dead and Benczeon prone and bleeding. She testified that Benczeon told her that "Tracy" had shot him, and that she immediately telephoned 911 and reported that Tracy had shot her boyfriend. Two men came upon the scene and dragged Benczeon toward the back of a building. Benczeon told them that defendants were the shooters.

Within hours of the shooting, Batts entered a hospital seeking treatment for a gunshot wound to his right shoulder. Batts was evasive with the officer who interviewed him, stating that he did not know where he had been when

---

[2]There is evidence suggesting that Batts and Benczeon may have been engaged in a territorial dispute concerning the sale of illegal drugs.

he was shot, and that he did not know who shot him. He later told another officer that he had been shot in Long Beach.[3]

When interviewed at the hospital, Benczeon told the police that defendants had shot him. Benczeon also identified Batts from a photographic lineup, but further stated that he was afraid for his family and did not want to testify or otherwise cooperate with the police. Thereafter, Batts's brother paid a visit to Benczeon in the hospital, leaving Benczeon upset and crying. Benczeon stated that Batts's brother had told him not to testify and impliedly had threatened Benczeon's family. In November 1997, Benczeon's 10-year-old brother received a telephone call threatening Benczeon.

Several weeks after the shooting, Benczeon attended a photographic lineup and identified McCrea and again identifed Batts. In January of 1998, McCrea's wife, Leslie Jones, contacted police to report a domestic assault. She informed an officer that McCrea had told her that he had killed persons before—including a "cousin in Compton"—and that she was afraid of him.

In January of 1998, Benczeon was shot and wounded by an unknown person. Benczeon believed that the shooting was related to his brother's killing and to his own involvement in the case against defendants. Nevertheless, Benczeon testified against defendant Batts in the first trial in this case in June 1998, implicating both Batts and McCrea in the September 12, 1997, shootings. (At that time, McCrea had not yet been apprehended, and thus the prosecution had proceeded to trial against Batts alone.)

Defendant Batts was convicted at the first trial of murder, but subsequently was granted a retrial based on newly discovered evidence—a confession of guilt from one Richard Nava, who at that time was awaiting sentencing on another gang-related murder and was housed in the same county jail module as defendant Batts.

In March 1999—nine months after the 1998 trial—Benczeon was brutally murdered after being chased and shot by assailants in two vehicles and then struck several times by traffic on a Compton street, in territory controlled by the Atlantic Drive Crips. No link between Benczeon's murder and defendants ever was established.

Meanwhile, defendant McCrea had been apprehended. The People then went forward with a second trial, this one a joint proceeding against both

---

[3]Benczeon denied that he or Brian were armed during the attack. But other testimony, introduced at the 2000 trial, called Benczeon's claim into doubt, suggesting that he or his brother also were armed.

defendants, held in late 1999. Benczeon's testimony from the first trial was read to the jury at the second trial.

Benczeon's testimony was admissible against Batts under two provisions of the Evidence Code: section 1291, permitting former testimony offered against a party to the earlier proceeding, and section 1231, which under certain circumstances allows admission of a decedent's sworn statements regarding gang-related crimes. Because McCrea was not a party to the first trial, Benczeon's testimony was admissible against McCrea under only the latter provision, section 1231.

One of the requirements for admissibility under Evidence Code section 1231 is that the decedent must have perished from *other than* natural causes. (*Id.*, subd. (e).) Section 1231.4 further provides: "If evidence of a prior statement is introduced pursuant to this article, *the jury may not be told that the declarant died from other than natural causes, but shall merely be told that the declarant is unavailable.*" (Italics added.) Consistent with this statutory mandate, the trial court issued an order tracking the statute's directive and emphasized several times before and during the trial to both the prosecution and the defense that counsel were not to mention Benczeon's death in front of the jury, and instead were to approach the bench should any such issue arise.

The events that led to termination of the second trial are as follows.

Prosecution witness Detective Marvin Branscomb, who had testified at the first trial, recounted on cross-examination that he had interviewed Benczeon shortly after the September 12, 1997, shooting, while Benczeon was in the hospital recovering from gunshot wounds to his leg, and that at that time Benczeon was "noncooperative," frightened, and concerned for his mother and other family members. Branscomb explained that he advised Benczeon of the district attorney's "witness relocation program," and told him "that we could see to it that he was part of that." Benczeon did not respond to the offer, but Branscomb advised him that he would discuss the possibility of the witness protection plan with Benczeon's mother.

Branscomb further testified that he did "eventually" give Benczeon $1,500 in cash from the witness protection program, to be used for first and last month's rent for a new apartment. But, Branscomb stated, he gave Benczeon that money on October 6, 1998—four months *after* Benczeon testified at the first trial.

Counsel for Batts, Stanley Granville, proceeded during the course of further cross-examination to ridicule Branscomb's testimony. Granville's

questions highlighted the absence of documentary evidence that the cash actually was used for relocation rent, and emphasized the four-month gap between Benczeon's earlier testimony and the relocation payment. Finally, Granville asked Branscomb whether the funds truly were just a "payoff" for Benczeon's testimony. Granville also emphasized in his examination the circumstance that, after the payment, Benczeon "never showed up" at various preliminary hearings that were held in defendants' cases. Of course, pursuant to article I, section 30, subdivision (b), of the California Constitution (added by Proposition 115 in 1990), Benczeon's hearsay statements made to Detective Branscomb were admissible through the detective, and hence he was not required to testify at those preliminary hearings. And in any event, as to one of those hearings, it was impossible for Benczeon to attend, because he had been murdered—a fact that, pursuant to the trial court's earlier ruling, was to be kept from the jury.

The two trial prosecutors were concerned that in light of defense counsel's cross-examination, the jury may have been left with the impression that the prosecution had "paid off" Benczeon for his testimony and then had made sure that Benczeon was not available to testify at subsequent preliminary hearings and before the jury in the second trial.[4] Seeking to rebut that implication, and deliberately ignoring the trial court's order that counsel not elicit testimony concerning the reason for Benczeon's unavailability without first discussing that matter with the court, the trial prosecutors took the following action. They met with Detective Branscomb during a recess, advised him that he would be asked on redirect examination why Benczeon did not appear at a specific preliminary hearing, and that in reply Branscomb "should tell the truth." The prosecutors also cautioned the detective, however, that prior to answering their question, he was to "make a significant pause," in order to afford defense counsel an opportunity to object.

During the ensuing redirect examination, one of the deputy district attorneys, Phillip Stirling, referred to the May 10, 1999 preliminary hearing that had been held for defendant McCrea, and inquired whether Benczeon had testified at that hearing. Detective Branscomb answered, "no." The prosecutor asked, "Why not?" Branscomb answered, "He was murdered."

---

[4]Two of the three preliminary hearings to which defense counsel had referred occurred prior to Benczeon's death. The other preliminary hearing to which defense counsel referred occurred on May 10, 1999—two months after Benczeon's demise. Regarding *that* preliminary hearing, however, defense counsel's specific question to Detective Branscomb referred to it as having occurred in *1998*. Accordingly, defendant Batts asserts in his answer to the brief of amicus curiae Los Angeles County District Attorney, "for all [the jury] knew, [that hearing] was in 1998." Nevertheless, taken as a whole, the questioning by defense counsel clearly implied that Benczeon had been "paid off" after his initial testimony and further implied that Benczeon had been available to testify both at the subsequent hearings and before the jury in the second trial, but nonetheless had not been required to testify.

The court called a recess and, outside the presence of the rest of the jury, questioned a juror who, the bailiff reported, had broken down in tears in response to Branscomb's answer. Both defendants moved for a mistrial. Thereafter the trial court held an extensive hearing on those motions.

Deputy District Attorney Larry Droeger argued that defense counsel's cross-examination of Detective Branscomb deliberately had misled the jury concerning the reason for Benczeon's absence from the prior proceedings and the trial, by suggesting that the prosecutors had paid off their witness after the first trial and then had taken further action to ensure that the witness remained unavailable, all so that the present jury would hear perjured testimony without subjecting Benczeon to cross-examination. Droeger argued that the message inherent in the cross-examination, "if accepted by the jury," would "devastate" and "destroy" the credibility of both Benczeon and Branscomb, and that it had impugned both prosecutors. Droeger continued: "How do we respond to that? Do we sit there and allow our credibility, our reputation to be attacked, the witness' credibility to be destroyed when it is a lie? I can't imagine what else we're supposed to do and what else any lawyer would expect us to do after that kind of attack." Finally, Droeger asserted that Detective Branscomb had been instructed to pause, and that "there was a significant pause," and yet there was no objection. From that, Droeger argued, it might be inferred that "they wanted this situation. They wanted the opportunity to ask for a mistrial."

In response, defense counsel argued that there was no reason to object, because defendants had a right to rely upon the trial court's prior rulings, and counsel had no reason to suspect that that the prosecutors or the witness would violate the court's explicit orders that the reason for Benczeon's absence not be disclosed.

In ruling upon defendants' motions for mistrial, the court observed that defense counsel's questioning "certainly could be interpreted as unfair questioning and unfair inferences. The People argued that that did, in fact, provide to the jury an unfair picture. And I'm inclined to think that it did." But, the court continued, even conceding that the prosecutors "did appropriately feel [that] they had been boxed in to an extent and perhaps been taken unfair advantage of," the prosecutors could and should have approached the bench and asked to work out a solution, and that "[t]here were other ways to make that jury absolutely clear that Benczeon Jones did not testify as a result of being paid off and lacking interest but rather that there were other good, legitimate legal reasons why Benczeon Jones wasn't there." The court noted that it was "shocked" and "stunned" by both the prosecutor's question and the answer. The court found that under the circumstances there was no

reasonable opportunity for defense counsel to object, and that the prosecutors had acted in "reckless disregard [of] the rights of the defendants in posing this question under the circumstances without it being screened." The court concluded that the prosecution "committed misconduct in presenting the question at issue. And knowing what its response would be, the error caused by such conduct is too serious to be corrected."

The trial court granted the motions for mistrial and then explained to the jury that it had done so, and the basis for its ruling. The court advised the parties that the matter later would be assigned to a court for further proceedings, possibly back to himself. Eventually the case was reassigned to the same trial judge—Honorable Jack W. Morgan—for retrial.[5]

Five weeks after the mistrial, and prior to the start of the third trial in this matter, Attorney William Ringgold, new counsel for defendant Batts, moved to dismiss on the basis that retrial was barred on double jeopardy grounds.[6] The motion was based exclusively upon *Kennedy, supra,* 456 U.S. 667, 676 [102 S.Ct. 2083, 2089-2090], in which the high court held that retrial is barred following a defendant's successful motion for mistrial if the prosecution *intended* to cause a mistrial. At a hearing conducted by Judge Morgan, Ringgold argued that retrial was barred because, in counsel's view, the prosecution had intended, by its misconduct, to cause a mistrial.

Although Ringgold's motion relied upon only the federal Constitution, Attorney Cedric Payne, McCrea's counsel, in joining Ringgold's motion, stated that he was moving for dismissal under the double jeopardy provision of the California Constitution as well as under the federal Constitution, and he asserted that he assumed Ringgold would agree that the motion should be considered under both constitutional provisions. Payne further asserted that the approach set out in *Kennedy, supra,* 456 U.S. 667, "encompasses what the rules are not only [under] the United States Constitution but I think

---

[5]At the hearing on the motions to dismiss, Judge Morgan disclosed that shortly after the mistrial motions were granted (but prior to the reassignment of the matter to himself), he had received an ex parte visit by Prosecutor Stirling, who "came in and, in essence, apologized for his conduct and left." The court recounted that "nothing substantive was discussed at all in regard to the case. It was simply a statement by Mr. Stirling that he apologized for his conduct, and he hoped it wouldn't . . . cause him to receive a bad reputation—I am paraphrasing—in the building. . . . [¶] I assured him that I would be objective and . . . [that the matter was] history as far as that and not a personal matter." Upon being informed of this ex parte meeting, defense counsel did not ask Judge Morgan to recuse himself.

[6]Ringgold was Batts's third counsel. Upon the granting of the mistrial, Stanley Granville, who had been retained to conduct only the second trial, was allowed to withdraw. Batts had been represented by yet another attorney at his first trial.

California has somewhat adopted that position, as well.[7] And [that approach requires a trial court to focus upon] whether or not, in the court's view," the prosecution intended to cause a mistrial.[8] The trial court proceeded to resolve the dismissal motion by determining, under *Kennedy, supra,* 456 U.S. 667, "whether or not the misconduct that occurred was in the view of the court caused by [the] prosecution's desire to cause a mistrial."

After hearing defense counsel's arguments, the trial court called upon trial Prosecutor Larry Droeger. (Prosecutor Stirling was absent.) Droeger commenced by noting that he was "in a position of arguing . . . something of which I have personal knowledge," namely his and Stirling's respective intent when they met with Detective Branscomb at the recess during the second trial, directed him to "tell the truth," and then proceeded to ask the detective, on redirect examination, why Benczeon had not been present at a certain preliminary hearing proceeding. Droeger offered to give his testimony under oath, but also added that any representation that he would make to the court would be made "as if it were under oath." Neither defense counsel asked that Droeger actually take an oath.

Droeger told the court that when he and Stirling made their decisions concerning their examination of Detective Branscomb, mistrial was "the farthest thing" from their minds. Droeger asserted that in their private discussions preceding the misconduct, the prosecutors had felt personally attacked, causing them to "let our emotional response overcome our rational response to the circumstances." He explained their belief that the defense had opened the door to inquiry concerning the true reason for Benczeon's absence at trial, and that simply asking Branscomb the question, rather than first proceeding to a sidebar discussion with the court and opposing counsel, was the appropriate way to "seize the moment." But, Droeger acknowledged, "that is where we made our mistake." Droeger further explained: "[The] one thing we thought we should do [was] tell the detective don't answer the question right away. They'll object. And then we'll go argue it at sidebar at that time . . . . And that was really the way we felt it was going to go down. We were perhaps as shocked as the court when the answer came out and when they 'didn't object. . . . [I]n our minds, we felt we were absolutely

---

[7]Counsel may have been referring to *People v. Valenzuela-Gonzales* (1987) 195 Cal.App.3d 728, 736-742 [241 Cal.Rptr. 114], in which the court held that the *Kennedy* rule should be the sole test applicable under the double jeopardy clause of California Constitution article I, section 15.

[8]Although in so moving, and in subsequent concluding remarks on the motion, counsel Payne referred to the state and federal "confrontation clause," when read in context counsel's statements clearly were intended to refer to the double jeopardy clause. It is apparent that the trial court understood defendants' motions and Counsel Payne's supplementary comments as raising state and federal double jeopardy issues.

sure that they were going to object when [Prosecutor Stirling] asked that question. . . . So in terms of our intention, . . . neither of us intended that we obtain a mistrial. Neither of us expected that a mistrial was going to be, in fact, granted until the court made its ruling. And it wasn't until then that we then started looking at it a little more rationally and in hindsight realized that we did make a tactical mistake in how we proceeded."

The trial court stated that, pursuant to its reading of *Kennedy, supra*, 456 U.S. 667, it would consider "the conduct and the circumstances and everything . . . that was involved in the trial . . . [i]n order to . . . make a determination as to whether or not, in fact, the District Attorney not only committed misconduct . . . but [also] whether or not that misconduct, in fact, was designed to cause a mistrial or whether it arose out of other circumstances justifiable and unjustifiable." The court noted it had observed the events leading up to the mistrial and that it had "a reasonable recollection of what was said and done." The court stated that in determining whether the district attorney intended to cause a mistrial, it would "look at the circumstances at [the time of the mistrial] in their totality . . . [a]nd from that, try to reason and judge whether the District Attorney would, in fact, want a mistrial."

Following that approach, the trial court first asserted that, until the time of the mistrial, the case was "overall . . . going very well for the People." The court recalled, "when I was evaluating this for several hours the night before I made the ruling . . . I was perplexed for among other reasons as to how this could occur when the District Attorney had things going, in this court's view, reasonably well from the People's point of view a strong case, strong evidence that had already been presented." The court stated that its "honest evaluation" was that "a District Attorney sitting in the circumstances that they were sitting in at the time would want to proceed and have a decision." The court acknowledged that the cross-examination suggesting that the People had paid off Benczeon, "*if left without rebuttal* . . . would have been a potential negative." (Italics added.) But, as the court previously had observed at the hearing on the mistrial motion, the prosecution *had* offered rebuttal testimony, explaining "how [the witness protection] process worked and how and why the money was given." The court also acknowledged that the defense cross-examination that immediately preceded the trial-ending misconduct unfairly suggested that the prosecution had allowed Benczeon to absent himself from later proceedings, but again noted, as the court had reasoned at the hearing on the mistrial motion, "there was available to the District Attorney a procedure for handling the problem"—specifically, the

prosecution could have approached the bench in order to work out acceptable means of correcting the false implication.[9] Based upon these considerations, the court concluded that a reasonable prosecutor would not have felt that the case would be lost merely because of the defense cross-examination. Nor, the trial court added, did it believe that the prosecutors here actually thought that, based upon the cross-examination, the case had been lost.[10]

The trial court mused that in attempting to discern the prosecutors' intent, "the only way to do it is circumstantially. We can't open their minds. . . . And I have attempted to do it that way. I do believe that I have objectively reviewed the situation and . . . although as I have said their conduct was perplexing to me . . . I honestly do not believe that their conduct occurred because they wanted a mistrial. I think their conduct occurred because they let their emotions run far beyond where they should have [run]. And I think they realize that." Having found that the prosecutors did not *intend to provoke a mistrial,* the trial court concluded that under the high court's decision in *Kennedy, supra,* 456 U.S. 667, a retrial was not precluded, and hence the court denied the motions to dismiss.

Defendants did not seek writ review of the trial court's ruling on their double jeopardy claim, and instead proceeded to another joint trial—the third trial for Batts, and the second for McCrea. At that trial, Richard Nava, whose earlier assertion of his own guilt in the underlying crimes had led to the vacating of Batts's first murder conviction, and who at the time of the third trial was serving a prison term of more than 130 years to life for an unrelated murder, testified that on the morning of September 12, 1997, the Jones brothers had robbed him of a kilo of cocaine, and that he later had returned with his "homeboy" (whom he refused to name) to Jones's apartment. Nava further testified that at that time, *he,* and not defendant Batts, engaged in a shoot-out with the Jones brothers. Nava's testimony, however, was thoroughly and compellingly impeached.

---

[9]The trial court commented: "Under the clearly described procedure that the court had set forth . . . it was anticipated that there would be problems particularly in sensitive areas. [¶] . . . [T]here was a way to [correct the unfair implication left by the defense cross-examination]. And that was simply to say, Judge, can we come to sidebar. And then say, Granville is pulling all kinds of things on us here. He has us backed in a corner. He's trying to make that jury believe we are paying off . . . that witness. That is absolutely unfair. This man is dead. What can we do about it, Judge? What will you do about it?"

The trial court proceeded to list options that could have been adopted to address the problem. The court observed that it could have delivered to the jury an appropriate cautionary instruction that there was "no reason" for the witness to have testified. Also, the court stated, it "could have considered other alternatives and would have had an open mind in terms of how best to handle this matter[,] recognizing that the People did have a legitimate concern."

[10]Specifically, after acknowledging the negative impact of the cross-examination on the prosecution's case, the court stated: "I don't see that it rises to a level that . . . a reasonable evaluation of the case would be that you're going to lose because of that, in the District Attorney's point of view. Nor do I believe that they thought that."

Defendants were convicted at the third trial of first degree murder and attempted murder, various charged sentencing enhancements were found true, and they were sentenced to terms of 88 years to life and 90 years to life respectively. On appeal from *that* judgment, defendants contended in the Court of Appeal that the trial court lacked authority to conduct the third trial, because the trial court assertedly had erred by failing to grant defendants' motions to dismiss the charges based upon double jeopardy grounds.

In the Court of Appeal, all parties argued the double jeopardy issue by focussing exclusively upon the federal Constitution and the intent-to-cause-mistrial test set out in *Kennedy, supra,* 456 U.S. 667. No party discussed whether the state provision (Cal. Const., art. I, § 15) requires an analysis different from the high court's intent-to-cause-mistrial test.

After reviewing the record, the Court of Appeal found the trial court's factual findings unsupported, and determined from its own reading of the record that the prosecutors did indeed intend to cause a mistrial by their misconduct at the second trial. Accordingly, the Court of Appeal concluded that retrial was barred and that the third trial should not have occurred. The Court of Appeal reversed defendants' convictions and ordered dismissal of the charges with prejudice. We granted the Attorney General's petition for review.

## II

We initially address two procedural issues.

■ First, the People observe that Penal Code sections 1016 and 1017 include, among those defenses that should be specifically pleaded, a claim of "once in jeopardy." The People suggest that because defendants in this litigation never entered such a plea, they have forfeited their double jeopardy claims. Courts long have observed, however, that "a claim of double jeopardy is most appropriately raised by way of a pretrial motion to dismiss the accusatory pleading or portion thereof allegedly barred by double jeopardy." (*Stone v. Superior Court* (1982) 31 Cal.3d 503, 509, fn. 1 [183 Cal.Rptr. 647, 646 P.2d 809], and cases cited.)

We reject the People's claim and agree with the Court of Appeal, which observed that although an affirmative plea of "once in jeopardy" apparently was not entered, defendants' motions to dismiss, which were made on double jeopardy grounds and fully litigated by the parties in the trial court, nevertheless "adequately covered this procedural requirement" and preserved the issue for review.

The Court of Appeal on its own raised a second procedural issue: "A more troubling question is why the defense did not seek a writ of prohibition after denial of the motions to dismiss. Prohibition is the preferred remedy, rather than putting everyone through the useless exercise of another trial. . . ." The Court of Appeal concluded, however, that under existing case law, defendants were permitted to proceed as they did and raise their double jeopardy claims on appeal, even though defendants did not first seek writ review to address those claims. (See *In re Lozoya* (1956) 146 Cal.App.2d 702, 704 [304 P.2d 156] [double jeopardy issue may be raised on appeal]); *In re McNeer* (1959) 173 Cal.App.2d 530, 531-534 [343 P.2d 304] [double jeopardy issue may be raised on habeas corpus].)

█ Consistent with the Court of Appeal's comment, we directed the parties to brief the following issue: "When a trial court denies a defendant's claim of double jeopardy, should the defendant be required to seek timely review of the denial by a petition for extraordinary writ as a condition to raising the double jeopardy claim on appeal?"

The People argue that a defendant must timely seek a writ of prohibition in order to preserve for appeal the issue of being placed twice in jeopardy. Defendants, on the other hand, contend that although a writ of prohibition often may be the more appropriate means of protecting a defendant's double jeopardy rights, the timely filing of a petition seeking such a writ should not be a *prerequisite* to raising the double jeopardy issue on appeal. Defendant McCrea argues that a requirement that an extraordinary writ be sought would burden the Courts of Appeal and defense counsel, "without any increase in judicial economy"; defendant Batts argues that long-standing authority permits review of a ruling on a double jeopardy claim by writ or by appeal, and that good reasons exist for retaining that flexible approach.

Both defendants rely upon *People v. Memro* (1985) 38 Cal.3d 658 [214 Cal.Rptr. 832, 700 P.2d 446] (*Memro*). In that case we thoroughly discussed and rejected a similar procedural requirement—whether review of the denial of discovery is available on appeal when the defendant fails to seek writ review on that same question. We declined in *Memro* to impose a procedural condition to raising that issue on appeal, reasoning as follows:

"While respondent correctly notes that pretrial review is appropriate in discovery matters [citations], he fails to cite any authority for the proposition that such review is a prerequisite to review of discovery error on appeal. Indeed, several courts on direct appeal have entertained claims of erroneously denied discovery motions of the type involved in this case. [Citations.]

"Respondent's argument also fails to recognize the unwarranted consequences which might result from a pretrial writ requirement. In addition to

unnecessary delay and added expense [citation], such a requirement would limit the exercise of this court's appellate jurisdiction, particularly in death penalty cases. [Citation.] This court's constitutional responsibility in such cases should not be so easily circumscribed by procedural barriers, especially where the people of this state have not clearly spoken on the issue.

"It is also noteworthy that in analogous contexts California courts have declined to impose barriers to appellate review where important rights are involved. For example, the courts have sanctioned review on appeal of speedy trial rulings (*People* v. *Wilson* (1963) 60 Cal.2d 139, 150 [32 Cal.Rptr. 44, 383 P.2d 452]), have held that no certificate of probable cause is required in juvenile appeals (*In re Joseph B*. (1983) 34 Cal.3d 952, 959-960 [196 Cal.Rptr. 348, 671 P.2d 852]), and have rejected a pretrial writ requirement as a condition to review of an unsuccessful *pro se* motion on appeal (*People* v. *Freeman* [(1977)] 76 Cal.App.3d [302,] 310-311 [142 Cal.Rptr. 806]). Since discovery rights are equally important, this court declines to impose a pretrial writ requirement as a condition to review on appeal." (*Memro, supra*, 38 Cal.3d 658, 675-676.)

Upon reflection, we agree that similar considerations apply here. In reaching this conclusion, we also find persuasive the circumstance that, of the scores of federal and out-of-state cases that we have reviewed (including *Kennedy, supra*, 456 U.S. 667), addressing in the same or analogous procedural posture the identical type of double jeopardy claim that we face here, we have not found *any* case suggesting that a defendant must seek writ review as a condition to raising the double jeopardy issue on appeal. We conclude that imposing such a procedural condition would be both unwarranted and unprecedented.

Accordingly, we proceed to discuss the merits of defendants' double jeopardy claim.

### III

The Fifth Amendment to the United States Constitution, which applies to the states through the Fourteenth Amendment (*Benton v. Maryland* (1969) 395 U.S. 784, 793-796 [89 S.Ct. 2056, 2061-2064, 23 L.Ed.2d 707]), protects defendants from repeated prosecution for the same offense (see, e.g., *United States v. DiFrancesco* (1980) 449 U.S. 117, 130 [101 S.Ct. 426, 433-434, 66 L.Ed.2d 328] (*DiFrancesco*); *United States v. Jorn* (1971) 400 U.S. 470, 479 [91 S.Ct. 547, 554, 27 L.Ed.2d 543] (lead opn. of Harlan, J.) (*Jorn*)), by providing that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb. . . ." We proceed to address

whether the motions to dismiss should have been granted because, as defendants assert, retrial is barred under the Fifth Amendment's double jeopardy clause.

## A

■ It is well established that the Fifth Amendment's double jeopardy clause bars reprosecution following a defendant's acquittal. (*Ball v. United States* (1896) 163 U.S. 662, 669 [16 S.Ct. 1192, 1194, 41 L.Ed. 300].)[11] It follows that a criminal defendant who is in the midst of trial has an interest, stemming from the double jeopardy clause, in having his or her case resolved by the jury that was initially sworn to hear the case—and in potentially obtaining an acquittal from that jury. (See *Wade v. Hunter* (1949) 336 U.S. 684, 689 [69 S.Ct. 834, 837, 93 L.Ed. 974] [noting a defendant's "valued right to have his trial completed by a particular tribunal"].)[12] It also follows that in certain circumstances, conduct by the prosecution or the court that results in mistrial, thereby terminating the trial prior to resolution by the jury, may impair that aspect of a defendant's protected "double jeopardy" interest.

The remedy for a violation of a defendant's Fifth Amendment double jeopardy right is strong medicine—dismissal of the charges and a permanent bar to retrial. (*Burks v. United States* (1978) 437 U.S. 1, 11, fn. 6 [98 S.Ct. 2141, 2147, 57 L.Ed.2d 1].) Over the years, the high court has developed case law defining the circumstances in which a claim to such a remedy may be raised, and the standards for establishing a double jeopardy violation.

In the event of a mistrial declared over the objection of the defendant, double jeopardy principles bar retrial unless the mistrial was justified by "manifest necessity"—for example, a hung jury. (*DiFrancesco, supra,* 449 U.S. 117, 130 [101 S.Ct. 426, 433-434]; *Jorn, supra,* 400 U.S. 470, 480-487 [91 S.Ct. 547, 554-558].)

In the event of a mistrial declared at the urging of the defendant, however (the situation we face in the case before us), the general rule is that the

[11]As the high court explained in *Green v. United States* (1957) 355 U.S. 184, 187-188 [78 S.Ct. 221, 223, 2 L.Ed.2d 199]: "The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty."

[12]See Ponsoldt, *When Guilt Should Be Irrelevant: Government Overreaching as a Bar to Reprosecution Under the Double Jeopardy Clause After Oregon v. Kennedy* (1983) 69 Cornell L.Rev. 76, 81 (noting that the high court's double jeopardy cases are concerned with preservation of a defendant's opportunity to obtain a favorable verdict from the first tribunal he or she confronts).

defendant's request for a mistrial constitutes consent that waives any double jeopardy claim, and hence there is no bar to retrial. (*DiFrancesco, supra,* 449 U.S. 117, 130 [101 S.Ct. 426, 433-434]; *United States v. Tateo* (1964) 377 U.S. 463, 467 [84 S.Ct. 1587, 1589-1590, 12 L.Ed.2d 448].) The exception to *this* general rule is addressed in *Kennedy, supra,* 456 U.S. 667, to which we now turn.

B

The defendant in *Kennedy* was charged with stealing a rug. The state called an expert witness to testify concerning the value and identity of the rug. On cross-examination, the defendant's counsel impeached the witness by revealing to the jury that the witness had filed a criminal complaint against the defendant, alleging fraudulent advertising. On redirect examination, the prosecutor attempted to reveal the reasons why the witness had filed a complaint against the defendant, but the trial court—perhaps erroneously—barred such inquiry. Thereafter, the prosecutor asked the witness whether he had "ever done business with [the defendant]." The witness responded that he had not, and the prosecutor immediately asked: "Is that because he is a crook?" The trial court granted the defendant's subsequent request for a mistrial. (*Kennedy, supra,* 456 U.S. 667, 669 [102 S.Ct. 2083, 2086]; see also *State v. Kennedy* (1980) 49 Or.App. 415 [619 P.2d 948, 949].)

The defendant moved under the Fifth Amendment's double jeopardy clause to bar the state's subsequent attempt to retry him. "After a hearing at which the prosecutor testified, the trial court found as a fact that 'it was not the intention of the prosecutor in this case to cause a mistrial.'" (*Kennedy, supra,* 456 U.S. 667, 669 [102 S.Ct. 2083, 2086], fn. omitted.) On that basis, the trial court rejected the defendant's federal double jeopardy challenge and denied the motion to dismiss. The defendant was retried and convicted.

On appeal from the resulting conviction, the defendant argued that the trial court erred by failing to grant his motion to dismiss. The Oregon Court of Appeals agreed, found a Fifth Amendment double jeopardy violation, and barred retrial. (*State v. Kennedy, supra,* 619 P.2d 948, 949.) That court observed that it was "bound" to accept the trial court's finding that the prosecutor did not intend to cause a mistrial. (*Ibid.*) But, relying on prior high court authority—*United States v. Dinitz* (1976) 424 U.S. 600, 611 [96 S.Ct. 1075, 1081-1082, 47 L.Ed.2d 267] (*Dinitz*), which stated that retrial is barred when a prosecutor's misconduct is "undertaken to harass or prejudice" the defendant, and *Jorn, supra,* 400 U.S. 470, 485 [91 S.Ct. 547, 557], which suggested that retrial would be barred if prosecutorial or judicial

misconduct amounted to "overreaching"—the Oregon appellate court concluded that retrial was barred under the federal double jeopardy clause because "the prosecutor's conduct in this case meets one of the other forbidden criteria, viz., overreaching." (*State v. Kennedy, supra,* 619 P.2d at p. 949.) Upon review, the United States Supreme Court in turn reversed the Oregon appellate decision, concluding that the federal double jeopardy clause did not bar a retrial. (*Kennedy, supra,* 456 U.S. 667, 679 [102 S.Ct. 2083, 2091].) The high court's conclusion was unanimous; its reasoning, however, was closely divided.

As suggested by the Oregon appellate court, prior high court decisions had stated that retrial in such circumstances should be barred when a prosecutor's misconduct was intended to (i) cause a mistrial, *or* (ii) result in harassment or overreaching sufficient to prejudice a defendant's double jeopardy interests. (*Lee v. United States* (1977) 432 U.S. 23, 34 [97 S.Ct. 2141, 2147-2148, 53 L.Ed.2d 80]; *Dinitz, supra,* 424 U.S. 600, 611 [96 S.Ct. 1075, 1081-1082]; *Jorn, supra,* 400 U.S. 470, 485 [91 S.Ct. 547, 557].)[13] The majority in *Kennedy* determined that the alternative standards under which retrial would be barred in circumstances in which the prosecutor did not intend specifically to cause a mistrial but instead intended merely to "harass" or "overreach," were improperly overbroad and unworkable in practice. (*Kennedy, supra,* 456 U.S. 667, 674-679 [102 S.Ct. 2083, 2088-2091].) ▮ Instead, the majority in *Kennedy* held that when a defendant has moved for a mistrial because of the prosecutor's misconduct and the mistrial motion has been granted, the *sole* basis for barring a retrial is a narrow one: retrial is barred only if the prosecutor intended by his or her misconduct to produce a mistrial. (*Id.,* at p. 679 [102 S.Ct. at p. 2091].) Applying that test, the majority reversed the judgment of the state court of appeals, thereby upholding the trial court's denial of the defendant's motion to dismiss.

Four members of the court signed Justice Stevens's concurring opinion in *Kennedy,* maintaining that the majority unnecessarily had abandoned the "harassment/overreaching" aspect of the standard that it had articulated and applied in the prior cases cited above, none of which resulted in the barring of a retrial. (*Kennedy, supra,* 456 U.S. 667, 681-684 [102 S.Ct. 2083, 2091-2094] (conc. opn. of Stevens, J., joined by Brennan, Marshall, and Blackmun, JJ.).) The concurring justices asserted that the majority's narrow standard, focussing solely upon the prosecutor's subjective intent to cause a mistrial, failed to address and protect interests at the core of the double jeopardy clause (*id.,* at p. 689 [102 S.Ct. at pp. 2096-2097]), and these

---

[13] In none of these cases, nor in any other high court case, however, did the court find retrial to be barred by the broader "overreaching conduct" standard.

justices maintained that in order to invoke the exception to the general rule permitting retrial after the defendant successfully moves for mistrial for "overreaching" by the prosecutor, "a court need not divine the exact motivation for the prosecutorial error. *It is sufficient that the court is persuaded that egregious prosecutorial misconduct has rendered unmeaningful the defendant's choice to continue or to abort the proceeding.*" (*Ibid.*, italics added.) The concurring justices agreed, however, that this broader standard was not met on the facts of the *Kennedy* case itself.[14]

Under the rule adopted by a majority of the high court in *Kennedy*, the federal Constitution bars retrial if, but only if, the prosecution intended to cause a mistrial. (E.g., *U.S. v. Gonzalez* (10th Cir. 2001) 248 F.3d 1201, 1203-1205.)[15] We proceed to apply that standard.

## C

In reviewing the record in order to assess evidence of intent by the prosecution to induce a successful mistrial motion, we are mindful of the high court's observation in *Kennedy, supra*, 456 U.S. 667, that it is to be expected that appellate judges "will not inexorably reach the same conclusion on a cold record at the appellate stage that they might if any one of them had been sitting [on the matter] as a trial judge," and that "appellate judges

---

[14]The concurring opinion reasoned that the defendant's double jeopardy rights were not violated, because the prosecutor's conduct at issue in *Kennedy* amounted to neither overreaching nor harassment and "could not have injected the kind of prejudice that would render unmeaningful the defendant's option to proceed with the trial." (*Kennedy, supra*, 456 U.S. 667, 693 [102 S.Ct. 2083, 2098] (conc. opn. of Stevens, J.).) In reaching this determination, the concurring opinion highlighted two general considerations that "follow from the rationale for recognizing the exception" to the general rule permitting retrial after a defendant successfully moves for mistrial. (*Id.*, at p. 690 [102 S.Ct. at p. 2097].) First, Justice Stevens reasoned, "because the exception is justified by the intolerance of intentional manipulation of the defendant's double jeopardy interests, a finding of deliberate misconduct normally would be a prerequisite to a reprosecution bar." (*Ibid.*, fn. omitted.) Second, Justice Stevens reasoned, "because the defendant's option to abort the proceeding after prosecutorial misconduct would retain real meaning for the defendant in any case in which the trial was going badly for him, normally a required finding would be that the prosecutorial error virtually eliminated, or at least substantially reduced, the probability of acquittal in a proceeding that was going badly for the government." (*Ibid.*, fns. omitted.)

[15]An extension of the *Kennedy* standard has been recognized by some lower courts that have addressed the related issue of the proper application of the federal double jeopardy clause in the context of prosecutorial misconduct that results not in a mistrial, but instead in an appellate reversal of a tainted conviction. (See, e.g., *U.S. v. Wallach* (2d Cir. 1992) 979 F.2d 912, discussed *post*, pt. IV.D.) Neither party suggests that a standard different from that articulated in *Kennedy* should be applicable to the federal double jeopardy claim at issue in the present case. The high court has not retreated from the standard set out in *Kennedy*, and we decline to address here whether any other test is applicable to a federal double jeopardy claim following the granting of a defendant's motion for mistrial.

[should] defer to the judgment of trial judges who are 'on the scene' in this area." (*Id.*, at p. 676, fn. 7 [102 S.Ct. at p. 2090].)

Consistent with that approach, our appellate courts have upheld trial court findings of a lack of intent on the part of the prosecution to induce a successful mistrial motion. In *Barajas v. Superior Court, supra,* 149 Cal.App.3d 30, the court noted that although it had "some discomfort with the trial court findings," and suspected that the trial court "may have had an overly benign view of the prosecutor's naivete," it nevertheless determined that "because we are precluded from weighing the facts, we conclude [that] substantial evidence supports the findings made by the trial court." (*Id.*, at p. 33, fn. 4; accord, *People v. Valenzuela-Gonzales, supra,* 195 Cal.App.3d 728, 736 (*Valenzuela-Gonzales*) [noting that the trial court's "findings on the issue are supported by substantial evidence, and, therefore, dispositive"].) In light of the holding in *Kennedy,* we shall apply the same deferential approach here.

As observed earlier, the Court of Appeal determined from the cold record that the prosecutors had intended to induce a successful mistrial motion. The court reasoned that by advising Detective Branscomb during the recess to "tell the truth," and then, upon resumption of redirect examination, asking him why Benczeon did not testify at prior hearings, the prosecutors must have intended to cause a mistrial. Defendants embrace this view, arguing, among other things, that (i) under the circumstances the prosecutor's serious misconduct could have been intended only to terminate the second trial; (ii) the record does not support the trial court's findings that the prosecution's case was, at the time of mistrial, "overall . . . going very well for the People" and that "a District Attorney sitting in the circumstances that they were sitting in at the time would want to proceed and have a decision"; (iii) the planning that occurred during the recess proves that the prosecutors wanted to terminate the second trial; and (iv) the prosecutors' initial assessment, articulated during the mistrial motion hearing, that the credibility of Benczeon and Detective Branscomb had been "devastated" by the defense cross-examination, shows they believed that they were losing the case, and intended to abort the trial in order to begin anew. Defendants also assert (v) that Prosecutor Droeger's accusations made during the dismissal hearing —that defense counsel had baited the prosecutors and thereby forced the successful mistrial motion—demonstrated instead that the prosecutors were "projecting" their own motives upon the defense, and in so doing revealed their own intention. Finally, defendants stress (vi) that the prosecutors gained various strategic advantages for the third trial by ending the second trial, and defendants discount the prosecutors' suggestions that retrial would have been risky for the prosecution because of various problems with the prosecution's witnesses.

■ We conclude that the Court of Appeal failed to accord proper deference to the trial court's factual findings. Indeed, a key passage of the Court of Appeal's analysis rejecting the trial court's findings is itself based upon a misreading of the reporter's transcript. The Court of Appeal stated: "Our review of the record persuades us that there is insufficient evidence to support the trial court's conclusion as to the prosecutors' intent. Indeed, the record persuasively establishes their desire to cause a mistrial. *In reaching this conclusion, we agree with an earlier assessment by the trial court*: 'I think as soon as those words were uttered, it was clear that a mistrial was going to occur. It wasn't so much, hey, let's try to somehow gloss it over. Let's try to somehow get to a point where we can make a corrective ruling or make some type of statement to the jury to somehow cure this mistake. It was obvious. And it was clear that when the district attorney, through their actions, through their plan, had Detective Branscomb state that he was murdered that meant that the case would be over.'" (Italics added.) The *trial court*, however, never uttered the quoted words; they were instead *defense counsel's* argument to the trial court, and as noted above, the trial court ultimately reached the opposite finding.[16] Granting appropriate deference to the trial court's *actual* findings based upon its firsthand observations, we conclude that those findings—that the prosecutors did not intend to cause a mistrial—are supported by substantial evidence.

The prosecutors instructed Detective Branscomb to provide a significant pause before answering their fateful question. Prosecutor Droeger stated that he and Prosecutor Stirling expected an objection prior to Branscomb's answer, and that they were surprised when no objection was made and the answer ensued. The record does, in fact, reflect that Detective Branscomb paused significantly before giving his answer.

Although defendants assert that inconsistent testimony by various prosecution witnesses at the 1999 trial rendered the prosecution's case weak and that the cross-examination of Detective Branscomb further weakened the prosecution's case, the trial court's contrary assessment of the strength of the prosecution's case is supported by substantial evidence. Specifically, the former testimony of Benczeon identified both defendants as the shooters, and he also positively identified the shooters from photo arrays. Benczeon's former testimony was corroborated by (i) Sonique Steward (Brian Jones's girlfriend), who stated that she saw defendant Batts arrive just prior to the

---

[16]Counsel for Batts, in his answer to the amicus curiae brief of the Los Angeles County District Attorney, asserts that the Court of Appeal's attribution of the above quote to "*the trial court*" was a mere "typographical error," and that actually the Court of Appeal intended merely to assert its agreement with "*the trial counsel.*" Viewing the Court of Appeal's syntax in context, we cannot agree with defense counsel's creative reading.

shootings and that Benczeon told her that Batts was one of the shooters; and by (ii) testimony that McCrea's wife, Leslie Jones, stated that she was afraid of McCrea because he had killed persons before, including a cousin (Brian Jones) in Compton.

Viewed as a whole, the record amply supports the trial court's finding that, immediately prior to the declaration of mistrial, the evidence pointing to defendants as the actual killers of Brian Jones on September 12, 1997, was quite strong, and that the cross-examination of Detective Branscomb was not of a nature that would have left a reasonable prosecutor with the belief that the case was lost and beyond rehabilitation. This evaluation by the trial judge supports the trial court's finding that the prosecutors did not intend to induce a successful mistrial motion.

In sum, we conclude that the record supports the trial court's determination that the prosecutors did not intend to cause a mistrial, and we defer to that factual finding.[17] It follows that the Court of Appeal erred by declining to defer to the trial court's supported findings. The trial court properly concluded that retrial is not barred under the federal Constitution, pursuant to the standard set out in *Kennedy, supra*, 456 U.S 667. (See *ante*, fn. 15.)

## IV

We turn to the state double jeopardy clause, article I, section 15, which, in language similar to but still somewhat different from the Fifth Amendment, provides: "Persons may not twice be put in jeopardy for the same offense . . . ." (Cal. Const., art. I, § 15.) The People ask us to "clarify" that the "intent-to-cause-mistrial" standard adopted by the high court in *Kennedy, supra*, 456 U.S. 667, also applies to and disposes of defendants' state constitutional double jeopardy claim. Defendants note that the scope of protection afforded by the state constitutional provision was not addressed in the trial court or in the Court of Appeal, but argue that if it becomes necessary to reach the issue (that is, if—as we have concluded—their Fifth Amendment claim does not entitle them to relief), we should conclude that article I, section 15, is more protective of double jeopardy rights than the Fifth Amendment as construed by the high court.

---

[17]In this regard, we agree with the observation of the Washington Court of Appeals: "When adrenaline overcomes judgment and trial court rulings are ignored, the trial may lose its civilized attributes and be reduced to the level of a dog chasing a cat. A mistrial will often be the result, as it was here. But we cannot say the trial court erred in characterizing the State's conduct as insufficient to bar a retrial. . . ." (*State v. Lewis* (1995) 78 Wash.App. 739 [898 P.2d 874, 877].)

## A

When the double jeopardy clause was made part of the 1849 California Constitution (1849 Cal. Const., art. I, § 8), it provided: "No person shall be subject to be twice put in jeopardy for the same offence." (Browne, Rep. of Debates in Convention of Cal. on Formation of State Const. (1850) appen., p. IV.) This language, which was borrowed from the New York Constitution (see Browne, p. 31), was endorsed by the drafters of the 1849 Constitution without debate. (*Id.*, pp. 30-31, 41.) Subsequently, the drafters of the 1879 Constitution adopted similar language ("No person shall be twice put in jeopardy for the same offense")—again, without debate. (Cal. Const., art. I, former § 13, now § 15; see 3 Willis & Stockton, Debates and Proceedings, Cal. Const. Convention 1878-1879, pp. 1188-1189, 1425-1426, 1491, 1509.) The parties have not cited, nor have we discovered, any indication in these materials suggesting that the drafters, or the electorate that adopted these provisions, considered the meaning of the double jeopardy guarantee in the context presented in this case. Nor have we discovered any evidence that the drafters of the 1974 constitutional revision of article I (the current incarnation of the double jeopardy clause, article I, section 15)—or the electorate that adopted it—considered the issue of the application of the double jeopardy guarantee in the context presented.[18] We must, nonetheless, determine the appropriate interpretation of article I, section 15 ("Persons may not twice be put in jeopardy for the same offense") as applied to the circumstances presented in this case.

As defendants observe, whereas the Fifth Amendment to the federal Constitution, as construed by *Kennedy, supra*, 456 U.S. 667, establishes the minimum standards of double jeopardy protection for criminal defendants, the California Constitution may provide a higher level of double jeopardy protection. (*Stone v. Superior Court, supra*, 31 Cal.3d 503, 510; see also *Raven v. Deukmejian* (1990) 52 Cal.3d 336 [276 Cal.Rptr. 326, 801 P.2d 1077].) Indeed, in some double jeopardy contexts our court has interpreted the double jeopardy safeguard in article I, section 15, of the California Constitution as providing greater protection than the double jeopardy clause

---

[18](See Cal. Const. Revision Com., Article I (Declaration of Rights) Background Study 4 (Dec. 1969) pp. 19, 24; Cal. Const. Revision Com., Article I (Declaration of Rights) Rep. IV (Feb. 1970) pp. 6-10; Cal. Const. Revision Com., Proposed Revision (pt. 5, 1971) p. 24; see generally Cal. Const. Revision Com., Rep., Materials Relating to Provisions in Cal. Const. Recommended or Endorsed by Com. (Dec. 10, 1974) pp. 74-81.) We also have examined the materials that were placed before the voters when the provision was amended in 1974. (Ballot Pamp., Gen. Elec. (Nov. 5, 1974) text of Prop. 7, pp. 26, 28-29.) We have found nothing in the ballot materials to suggest that the voters' attention was focussed upon the scope of the double jeopardy guarantee as it relates to the issue we face here.

of the federal Constitution. (See *Curry v. Superior Court* (1970) 2 Cal.3d 707, 716 [87 Cal.Rptr. 361, 470 P.2d 345] [construing state double jeopardy provision to bar retrial after the granting of a mistrial on the trial court's own motion and without the defendant's consent, but for the defendant's benefit, and declining to adopt the applicable federal constitutional rule of *Gori v. United States* (1961) 367 U.S. 364, 369 [81 S.Ct. 1523, 1526-1529, 6 L.Ed.2d 901]]; *People v. Collins* (1978) 21 Cal.3d 208, 216 [145 Cal.Rptr. 686, 577 P.2d 1026] [construing state double jeopardy provision to bar imposition of greater sentence on retrial after the defendant's successful appeal, contrary to the applicable federal constitutional rule of *North Carolina v. Pearce* (1969) 395 U.S. 711, 719-721 [89 S.Ct. 2072, 2077-2079, 23 L.Ed.2d 656].) In other circumstances, however, we have construed the state double jeopardy provision consistently with its federal counterpart. (*People v. Monge* (1997) 16 Cal.4th 826, 844-845 [66 Cal.Rptr.2d 853, 941 P.2d 1121] (*Monge*) (lead opn. of Chin., J.) [neither state nor federal double jeopardy clause applies to retrial of a prior conviction allegation that previously was reversed on appeal for insufficient evidence].) The question is, which approach is appropriate in the case now before us? As we observed in *Monge, supra,* 16 Cal.4th at page 844, " ' "cogent reasons must exist" ' " before we will construe the double jeopardy clause of the state Constitution differently from its federal counterpart. We proceed to explore whether such reasons exist under the circumstances presented by the instant case.

B

Sister state jurisdictions that have determined the proper interpretation of their own state Constitution's double jeopardy clause under similar circumstances have divided between following the narrow *Kennedy* test, and a broader, more expansive test.[19] We examine those two lines of cases below.

[19]Most state jurisdictions have not addressed the question, and many others expressly have left it open. Indeed, this court itself has previously noted, and declined to resolve, a related issue. In *In re Martin* (1987) 44 Cal.3d 1 [241 Cal.Rptr. 263, 744 P.2d 374], a habeas corpus proceeding in this court, the petitioner successfully argued that his convictions for conspiracy to commit extortion, and second degree murder, should be set aside because at the petitioner's trial the prosecution interfered with the petitioner's right to present the testimony of three of his witnesses. (*Id.*, at p. 52.) The petitioner in *Martin* also asserted that in view of the misconduct, retrial—which, we observed, is the normal consequence when it is determined on habeas corpus that a judgment is void—should be barred, under the circumstances, by federal and state double jeopardy principles. (*Id.*, at p. 53.) We rejected the petitioner's federal double jeopardy claim under *Kennedy, supra,* 456 U.S. 667, and then turned to the petitioner's alternative contention, made under the state Constitution, article I, section 15: "Specifically, [petitioner] derives a general 'rule' from Justice Stevens's concurring opinion in *Kennedy,* to the effect that the double jeopardy clause bars retrial when the prosecution 'engage[s] in "overreaching" or "harassment" ' (456 U.S. at p. 683 [72 L.Ed.2d at p. 429]), i.e., misconduct that amounts to the 'intentional manipulation of the defendant's double jeopardy interests'

1

Based in large part upon its clarity and perceived ease of application, the narrow "intent-to-cause-mistrial" test set out by the majority in *Kennedy, supra*, 456 U.S. 667, has been adopted by the high courts of six states as the appropriate test under the double jeopardy clause of each jurisdiction's constitution. (*State v. Bell* (Iowa 1982) 322 N.W.2d 93, 94; *State v. Chapman* (Me. 1985) 496 A.2d 297, 300; *State v. Diaz* (R.I. 1987) 521 A.2d 129, 133; *State v. White* (1988) 322 N.C. 506 [369 S.E.2d 813, 815]; *Harris v. People* (Colo. 1995) 888 P.2d 259, 266, fn. 4; *State v. Williams* (1999) 268 Kan. 1 [988 P.2d 722, 727-728].) The *Kennedy* test also has been endorsed as the appropriate standard under California Constitution, article I, section 15, in one California Court of Appeal decision.[20]

Nevertheless, the intent-to-cause-mistrial test has been viewed as inadequate because it protects only a very narrow range of a defendant's legitimate double jeopardy interests. (See Henning, *Prosecutorial Misconduct and Constitutional Remedies* (1999) 77 Wash.U. L.Q. 713, 803-808 (*Constitutional Remedies*); Ponsoldt, *When Guilt Should Be Irrelevant: Government Overreaching as a Bar to Reprosecution Under the Double Jeopardy Clause After Oregon v. Kennedy, supra,* 69 Cornell L.Rev. 76, 94-99 (*Government Overreaching*); Rosenthal, *Prosecutor Misconduct, Convictions, and*

---

(*id.*, at p. 690 [72 L.Ed.2d at p. 434] (conc. opn. of Stevens, J.)). He then claims that this 'rule' constitutes the proper test for implementing the independent state constitutional guarantee against double jeopardy. Finally, he concludes that under this 'rule' retrial is barred in this case." (*Martin, supra,* 44 Cal.3d 1, 54.) We held that "[e]ven if the 'rule' is sound and constitutes the proper test for implementing the independent state constitutional guarantee, its application to the facts of this case does not result in the outcome petitioner seeks. . . . [A]lthough petitioner has clearly demonstrated that the prosecution engaged in prejudicial misconduct at his trial, he has simply failed to show that it 'intentional[ly] manipulat[ed] . . . [his] double jeopardy interests . . . .' " (*Ibid.*)

[20]In *Valenzuela-Gonzales, supra,* 195 Cal.App.3d 728, the prosecutor asked a witness a question relating to the defendant's prior drug arrest, and in response the trial court indicated that it would not allow questioning on that subject. Later, however, the prosecutor asked another witness whether the defendant "has any problems with drugs." The defendant objected and moved for a mistrial, which the court granted, based upon the prosecutor's misconduct. (*Id.*, at p. 732.) Thereafter the defendant entered a plea of once in jeopardy and filed a motion to sustain that plea. The trial court denied the motion. In detailed findings, the court concluded that the prosecutor did not intend to cause a mistrial, but instead simply was attempting to obtain a conviction. (*Id.*, at pp. 734-736.) The Court of Appeal concluded that the trial judge's findings were "supported by substantial evidence, and, therefore, dispositive." (*Id.*, at p. 736.) Accordingly, the court concluded that the Fifth Amendment's double jeopardy bar did not apply. (*Ibid.*) The Court of Appeal, considering the defendant's arguments in support of construing the California Constitution's double jeopardy clause in a broader and more protective fashion, acknowledged that at the time (1987), two states— Oregon and Arizona—had adopted such an approach, but it declined to do so under article I, section 15.

*Double Jeopardy: Case Studies in an Emerging Jurisprudence* (1998) 71 Temple L.Rev. 887, 892-895, 909-917, 961 (*Emerging Jurisprudence*); Thomas, *Solving the Double Jeopardy Riddle* (1996) 69 So.Cal. L.Rev. 1551, 1563-1564; Reiss, *Prosecutorial Intent in Constitutional Criminal Procedure* (1987) 135 U.Pa. L.Rev. 1365, 1425-1428 (*Prosecutorial Intent*).) For example, as noted by Professor Reiss in *Prosecutorial Intent, supra,* 135 U.Pa. L.Rev. at page 1426: "When a defendant's 'valued right to have his trial completed by a particular tribunal' is threatened by serious prosecutorial misbehavior at trial, *Kennedy* does much to deny any protection of the right . . . [because it] eliminates any double jeopardy concern with prosecutorial overreaching prompted by improper motives other than the intent to provoke a mistrial. Thus, a defendant faced with a prosecutor who is willing to commit reversible error for other improper reasons . . . has no redress under the clause." (Fns. omitted.)

The federal test's application to the facts of this case (see *ante*, pt. III.C) illustrates the narrow scope and limitations of that test. Had the prosecutors intentionally committed their misconduct *not* to cause a mistrial, but instead to improperly prejudice the jury to convict in order to avoid a likely acquittal, the prosecutors' misconduct clearly would implicate defendants' double jeopardy interests, which, as we have seen, include a defendant's " ' "valued right to have his trial completed by a particular tribunal." ' " (*People v. Marshall* (1996) 13 Cal.4th 799, 824 [55 Cal.Rptr.2d 347, 919 P.2d 1280] [construing federal and state double jeopardy clauses]; see also *Government Overreaching, supra,* 69 Cornell L.Rev. 76, 81.) And yet *that aspect* of a defendant's double jeopardy interests lies outside the high court's narrow test, and is unprotected by it. ■ Because the state double jeopardy clause is implicated when a prosecutor, believing that a particular jury is likely to return an acquittal, intentionally commits misconduct in order to improperly prejudice the jury and obtain a conviction—and because the majority's narrow test in *Kennedy* fails to protect that aspect of a defendant's double jeopardy interests—we conclude that the federal test, standing alone, is insufficient to protect interests that our state Constitution's double jeopardy clause is intended to safeguard.

2

Competing tests designed to more fully protect double jeopardy interests have been adopted by the high courts of six states. (*State v. Kennedy* (1983) 295 Or. 260 [666 P.2d 1316, 1326] (*Kennedy II*); *Pool v. Superior Court* (1984) 139 Ariz. 98 [677 P.2d 261, 271-272] (*Pool*); *Com. v. Smith* (1992) 532 Pa. 177 [615 A.2d 321, 325] (*Smith*); *State v. Breit* (1996) 122 N.M. 655 [930 P.2d 792, 803] (*Breit*); *Bauder v. State* (Tex.Crim.App. 1996) 921

S.W.2d 696, 699 (*Bauder*); *State v. Rogan* (1999) 91 Hawaii 405 [984 P.2d 1231, 1249] (*Rogan*).)

These broader tests, however, have been subject to criticism as well. The standards adopted by Pennsylvania in *Smith, supra,* 615 A.2d 321, and by Hawaii in *Rogan, supra,* 984 P.2d 1231, for example, bar reprosecution not only when prosecutorial misconduct is intended to cause a mistrial, but also when a prosecutor's conduct is "intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial" (*Smith, supra,* 615 A.2d at p. 325)[21] or is "so egregious that, from an objective standpoint, it clearly denied a defendant his or her right to a fair trial." (*Rogan, supra,* 984 P.2d at p. 1249, fn. omitted).[22] These standards appear to blur inappropriately the line between (i) the "normal" species of prejudicial prosecutorial misconduct that violates a defendant's due process right to a fair trial and hence warrants the granting of a mistrial or the reversal of any conviction and a retrial of the offense, and (ii) the exceptional form of prosecutorial misconduct that warrants not only a mistrial or reversal of any resulting conviction, but also dismissal of the charges and a prohibition of any reprosecution of the defendant for the offense.[23]

---

[21]The Pennsylvania Supreme Court held in *Smith*: "[T]he double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial." (*Smith, supra,* 615 A.2d 321, 325, overruling *Com. v. Simons* (1987) 514 Pa. 10 [522 A.2d 537, 540-541], in which the court had adopted the narrow test of *Kennedy* as the appropriate test under the state double jeopardy clause.)

[22]The Supreme Court of Hawaii held in *Rogan* that under the state double jeopardy clause, "reprosecution of a defendant after a mistrial or reversal on appeal as a result of prosecutorial misconduct is barred where the prosecutorial misconduct is so egregious that, from an objective standpoint, it clearly denied a defendant his or her right to a fair trial. In other words, we hold that reprosecution is barred where, in the face of egregious prosecutorial misconduct, it cannot be said beyond a reasonable doubt that the defendant received a fair trial." (*Rogan, supra,* 984 P.2d 1231, 1249, fns. omitted.)

[23]In *Smith, supra,* 615 A.2d 321, the Pennsylvania court barred retrial in a double murder case because of extensive, pervasive, and outrageous misconduct by the prosecution, including the presentation of knowingly false testimony. In *Rogan, supra,* 984 P.2d 1231, the Hawaii court barred retrial in a sexual assault case after the prosecutor, at closing argument, made a single, but wholly inappropriate, remark that invited the jury to exercise racial prejudice. In both cases, it may be assumed that flagrant *due process* violations occurred, and that the defendant in each instance was deprived of a fair trial. But in neither case did the reviewing court clearly articulate independent reasons for its conclusion that a *double jeopardy violation*, triggering dismissal and a bar to reprosecution, also occurred. Instead, it appears that in each case, the reviewing court was so offended by the misconduct that it concluded that the normal remedy—reversal and retrial—was inadequate. As a dissenting justice observed in a subsequent Pennsylvania Supreme Court case extending *Smith,* "a double jeopardy standard focussing upon the prosecutor's generalized culpability as it relates to fairness lacks appropriate constraints." (*Com. v. Martorano* (1999) 559 Pa. 533 [741 A.2d

The standards adopted in Oregon, Arizona, New Mexico, and Texas exhibit similar problems. The Oregon Supreme Court, in *Kennedy II, supra,* 666 P.2d 1316, construed the Oregon Constitution's double jeopardy clause as barring retrial "when improper official conduct is so prejudicial to the defendant that it cannot be cured by means short of a mistrial, and *if the official knows that the conduct is improper and prejudicial and either intends or is indifferent to the resulting mistrial or reversal.*" (*Id.,* at p. 1326, italics added.) The Arizona Supreme Court has adopted a similar standard, finding retrial barred under the Arizona Constitution "when a mistrial is granted on motion of defendant or declared by the court under the following conditions: [¶] 1. Mistrial is granted because of improper conduct or actions by the prosecutor; and [¶] 2. such conduct is not merely the result of legal error, negligence, mistake, or insignificant impropriety, but, taken as a whole, amounts to *intentional conduct which the prosecutor knows to be improper and prejudicial, and which he pursues for any improper purpose with indifference to a significant resulting danger of mistrial or reversal;* and [¶] 3. the conduct causes prejudice to the defendant which cannot be cured by means short of a mistrial." (*Pool, supra,* 677 P.2d 261, 271-272, italics added, fn. omitted.) The New Mexico Supreme Court has adopted a modified version of the Oregon standard, finding retrial barred under the New Mexico Constitution "when improper official conduct is so unfairly prejudicial to the defendant that it cannot be cured by means short of a mistrial or a motion for a new trial, and if *the official knows that the conduct is improper and prejudicial, and if the official either intends to provoke a mistrial or acts in willful disregard of the resulting mistrial, retrial, or reversal.*" (*Breit, supra,* 930 P.2d 792, 803, italics added.)

In our view, each of these tests (and a similar formulation from Texas)[24] is less than satisfactory, because none articulates explicitly the precise *double jeopardy basis* for a conclusion that the principles underlying a defendant's double jeopardy interest have been violated. Accordingly, as applied to different factual settings, each test improperly may mandate

1221, 1226] (dis. opn. of Saylor, J.).) In a similar vein, Professor Henning, in *Constitutional Remedies, supra,* 77 Wash.U. L.Q. 713, 813, has criticized the tendency of courts to "respond[] to the superficial allure of the double jeopardy remedy which automatically prohibits a retrial, because the severity of the sanction appear[s] to punish the prosecutor for his misconduct in a way that a new trial [would] not. Yet, double jeopardy is neither another form of the due process protection ensuring the propriety of the criminal trial nor a means to protect against outrageous government conduct."

[24]Pursuant to Texas law, "a successive prosecution is jeopardy barred [under the Texas Constitution's double jeopardy clause] after declaration of a mistrial at the defendant's request, not only when the objectionable conduct of the prosecutor was intended to induce a motion for mistrial, but also *when the prosecutor was aware but consciously disregarded the risk that an objectionable event for which he was responsible would require a mistrial at the defendant's request.*" (*Bauder, supra,* 921 S.W.2d 696, 699, italics added.)

*double jeopardy* relief (that is, barring any trial) for instances of prosecutorial misconduct that more appropriately should be remedied by reversal and retrial. (See *Constitutional Remedies, supra,* 77 Wash.U. L.Q. 713, 813 [criticizing application of the New Mexico standard as affording a double jeopardy remedy for a due process violation].)

C

As noted above, we have concluded that a narrow test, focussing solely upon whether the prosecutor intended to induce a successful mistrial motion, fails to protect fully the legitimate interest of a defendant in securing a resolution (and possible acquittal) in the pending trial, and hence inadequately protects double jeopardy interests set out in California Constitution article I, section 15. Accordingly, we conclude that "cogent reasons . . . exist" for construing the double jeopardy clause of the state Constitution differently from its federal counterpart (*Monge, supra,* 16 Cal.4th 826, 844) and that a broader test is required in order to more fully protect double jeopardy interests guaranteed under our state Constitution.[25]

At the same time, the standard that we adopt should not be so broad as to lead to the imposition of the double jeopardy bar—with its drastic sanction prohibiting retrial—in circumstances in which such a sanction is unwarranted. What is needed is a standard that sufficiently protects double jeopardy interests, but also retains and enforces a distinction between "normal" prejudicial prosecutorial misconduct that violates a defendant's due process right to a fair trial and warrants reversal and retrial, and the form of prosecutorial misconduct that not only constitutes a due process violation but also a double jeopardy violation, and hence warrants not only reversal but dismissal and a bar to reprosecution.

D

In formulating such a standard, we find helpful a line of decisions stemming from the decision of the Second Circuit Court of Appeals in *U.S. v. Wallach, supra,* 979 F.2d 912 (*Wallach II*), a decision that considered the double jeopardy consequences not of *a mistrial* based upon prosecutorial misconduct, but instead of *a reversal of a conviction on appeal* because of prosecutorial misconduct at trial. The decision in *Wallach II* followed the Second Circuit's earlier decision in *U.S. v. Wallach* (2d Cir. 1991) 935 F.2d 445 (*Wallach I*), and we begin with a brief summary of the first *Wallach* decision.

---

[25]To the extent it is inconsistent with this conclusion, *People v. Valenzuela-Gonzales, supra,* 195 Cal.App.3d 728, is disapproved.

At the criminal trial at issue in *Wallach I, supra,* 935 F.2d 445, a key prosecution witness, who previously testified that he had forsworn gambling after a certain time, was impeached with documentary evidence (gambling markers) suggesting that, during the relevant time, the witness in fact had continued to engage in gambling. This impeachment was wholly collateral to the case against the defendant (Wallach), but it clearly reflected on the witness's credibility. On redirect examination by the prosecution, the witness offered an innocent explanation for the gambling documentation, asserting, for example, that in fact he had obtained $50,000 in chips but had given them to a friend and had not used them himself. (*Id.,* at pp. 453-456.) Wallach was convicted, and thereafter additional evidence surfaced, making it clear that the prosecution witness indeed had lied concerning his own gambling. At that point the government prosecuted and convicted the witness for perjury. Wallach's subsequent motion for a new trial was granted, his convictions were reversed on the ground of prosecutorial misconduct (the court concluding that the government "should have known" that the witness was committing perjury when he claimed to have stopped gambling), and a new trial was ordered. (*Id.,* at p. 457.)

Prior to the commencement of retrial on reduced counts, Wallach moved to dismiss on double jeopardy grounds, asserting that retrial was barred. The district court denied that motion, and upon review the Second Circuit, in *Wallach II, supra,* 979 F.2d 912, affirmed the district court's ruling, concluding that retrial was not barred. Addressing Wallach's contention that under the rationale of the high court's decision in *Kennedy, supra,* 456 U.S. 667, the federal double jeopardy clause " 'bars a second prosecution when the prosecutor engages in serious misconduct *with the intention of preventing an acquittal*' " (*Wallach II, supra,* 979 F.2d at p. 915, italics added), the circuit court agreed that "there is force to Wallach's argument for some sort of extension" of *Kennedy* in the context before it, but reasoned that "[e]very action of a prosecutor in the course of a trial is taken 'with the intention of preventing an acquittal.' [Citation.] If the rationale of *Kennedy* were as broad as claimed by Wallach, the Double Jeopardy Clause would bar retrial of every defendant whose conviction is reversed because of intentional misconduct on the part of a prosecutor. For example, knowing use of perjured testimony that 'could have affected the judgment of the jury' would result not only in reversal of a conviction, [citation] but also in a bar to retrial on jeopardy grounds. The Supreme Court could not possibly have mandated that result in *Kennedy.* Such a result would obliterate the precise distinction drawn in *Kennedy* between misconduct that merely results in a mistrial and misconduct undertaken for the specific purpose of provoking a mistrial." (*Id.,* at p. 916.)

The court in *Wallach II* continued: "If any extension of *Kennedy* beyond the mistrial context is warranted, it would be a bar to retrial only where *the*

*misconduct of the prosecutor is undertaken, not simply to prevent an acquittal, but to prevent an acquittal that the prosecutor believed at the time was likely to occur in the absence of his misconduct.*" (*Wallach II, supra,* 979 F.2d 912, 916, italics added.) The court explained: "The prosecutor who acts with the intention of goading the defendant into making a mistrial motion presumably does so because he believes that completion of the trial will likely result in an acquittal. That aspect of the *Kennedy* rationale suggests precluding retrial where a prosecutor apprehends an acquittal and, instead of provoking a mistrial, avoids the acquittal by an act of deliberate misconduct. Indeed, if *Kennedy* is not extended to this limited degree, a prosecutor apprehending an acquittal encounters the jeopardy bar to retrial when he engages in misconduct of sufficient visibility to precipitate a mistrial motion, but not when he fends off the anticipated acquittal by misconduct of which the defendant is unaware until after the verdict. There is no justification for that distinction." (*Ibid.*)

The court in *Wallach II* concluded, however, that even under this broader standard, no double jeopardy violation was demonstrated in that case, because "[t]he evidence against Wallach and his co-defendants was quite strong," giving the prosecution "every reason to anticipate a conviction" (*Wallach II, supra,* 979 F.2d 912, 916), and because the record supported the trial court's finding that the prosecutors did not know of the perjury. (*Id.,* at p. 917.) Accordingly, the court determined, "the factual predicate" for finding a double jeopardy violation—"deliberate prosecutorial misconduct undertaken to avoid an acquittal that the prosecutors believed was likely in the absence of their misconduct—is totally lacking." (*Ibid.*)

Because we need consider in the present case only the proper standard under the state double jeopardy clause for prosecutorial misconduct that triggers a defendant's successful *mistrial* motion, we need not, and do not, determine whether *Wallach II* articulates a proper test—under *either* the federal or state constitutional double jeopardy clauses—for misconduct that results in *reversal on appeal* or in relief on habeas corpus. (See *ante,* fns. 15 & 19.)[26] Our sole concern in this case is the proper test under our state Constitution's double jeopardy clause for intentional prosecutorial misconduct that produces not a reversal on appeal, but a mistrial. In formulating

---

[26]The test set out in *Wallach II* has been reaffirmed by the Second Circuit, and endorsed by the First Circuit Court of Appeals and various state jurisdictions. (*U.S. v. Pavloyianis* (2d Cir. 1993) 996 F.2d 1467, 1473-1475 [finding no double jeopardy bar]; *U.S. v. Gary* (1st Cir. 1996) 74 F.3d 304, 315 [same]; *State v. Colton* (1995) 234 Conn. 683 [663 A.2d 339, 344-348] [remanding for *Wallach II* findings under federal double jeopardy clause]; *State v. Lettice* (1998) 221 Wis.2d 69 [585 N.W.2d 171, 180-181] [imposing double jeopardy bar]; *State v. Chase* (2000) 2000 Me. 114 [754 A.2d 961, 964] [finding no double jeopardy bar]; *State v. Marti* (2001) 147 N.H. 168 [784 A.2d 1193, 1196-1197] [same].) Other jurisdictions have declined to adopt the approach set out in *Wallach II, supra,* 979 F.2d 912 (e.g., *State v.*

such a test, we find the decision in *Wallach II* to be helpful because it illuminates a double jeopardy interest beyond the narrow one recognized in *Kennedy, supra,* 456 U.S. 557. *Wallach II* recognizes that a defendant's double jeopardy rights are implicated not only when a prosecutor intends to and does provoke a mistrial, but also when a prosecutor intentionally commits misconduct in order to deprive the defendant of an acquittal that the prosecutor believed, in light of the events at trial (including reactions and demeanor of the jury), was likely to occur in the absence of the misconduct. Because we believe the decision in *Wallach II* accurately identifies the scope of interests that the California double jeopardy clause is intended to protect, we find that opinion useful in crafting an appropriate state double jeopardy standard. (See *Emerging Jurisprudence, supra,* 71 Temple L.Rev. 887, 909 [*Wallach II* test "open[s] the way to a double jeopardy/misconduct jurisprudence that is far more satisfactory than the narrow holding of *Kennedy,*" because it is "tied directly to the principles and rationale underlying the double jeopardy protection in the first place"].)

E

■    Without attempting to articulate a double jeopardy test that will be applicable in all circumstances, we conclude that the double jeopardy clause of California Constitution article I, section 15 bars retrial following the grant of a defendant's mistrial motion (1) when the prosecution intentionally commits misconduct for the purpose of triggering a mistrial, and also (2) when the prosecution, believing in view of events that unfold during an ongoing trial that the defendant is likely to secure an acquittal at that trial in the absence of misconduct, intentionally and knowingly commits misconduct in order to thwart such an acquittal—and a court, reviewing the circumstances as of the time of the misconduct, determines that from an objective perspective, the prosecutor's misconduct in fact deprived the defendant of a reasonable prospect of an acquittal. (See *Kennedy II, supra,* 666 P.2d 1316, 1326; *Wallach II, supra,* 979 F.2d 912, 916-917; *Emerging Jurisprudence, supra,* 71 Temple L.Rev. 887, 916.)

In our view, the latter aspect of the test, which requires a court to find, as an objective matter, that the prosecution's misconduct in fact deprived the

*Swartz* (Iowa Ct.App. 1995) 541 N.W.2d 533, 538-540 [but also noting that, on the facts before it, the court would find retrial not barred under the *Wallach II* approach]; *Ex Parte Mitchell* (Tex.Crim.App. 1997) 977 S.W.2d 575, 579-580; *State v. Keenan* (1998) 81 Ohio St.3d 133 [689 N.E.2d 929, 940]). Still other jurisdictions that initially expressed skepticism have since spoken positively of the *Wallach II* approach. (Compare *U.S. v. Doyle* (7th Cir. 1997) 121 F.3d 1078, 1085 (per Posner, J.) with *U.S. v. Catton* (7th Cir. 1997) 130 F.3d 805, 807-808 (per Posner, J.).) See generally *Emerging Jurisprudence, supra,* 71 Temple L.Rev. at pages 926-933.

defendant of a reasonable or realistic prospect of acquittal, is appropriate to guard against an unwarranted imposition of the double jeopardy bar. If, despite a prosecutor's subjective belief that an acquittal was likely to occur in the absence of misconduct, the court determines that, *from an objective perspective*, an acquittal was not a realistic prospect, a bar of retrial, permanently relieving such a defendant of any criminal responsibility for his or her charged conduct, would constitute a windfall for the defendant. In our view, when such prosecutorial misconduct has not deprived a defendant of a reasonable prospect of an acquittal, double jeopardy interests are not unfairly compromised if a defendant who successfully moves for a mistrial remains subject to retrial.[27]

Applying the foregoing test to the present case, it is apparent that the misconduct was intentional, and that its prejudicial impact was sufficient to justify the trial court's decision to grant a mistrial. As noted *ante*, part III.C, however, the trial court's findings amply support its conclusion that the misconduct was not committed with the intent to induce a mistrial. Accordingly, in this case, the state constitutional double jeopardy guarantee would bar retrial only if the deliberate misconduct was intended by the prosecution to prevent an acquittal that the prosecution subjectively believed at the time was likely to occur in the absence of the misconduct, *and* acquittal was, in fact, an objectively reasonable prospect absent the misconduct.

Although the trial court did not have in mind the subjective intent standard that we now articulate, and hence did not expressly consider whether the prosecutors' deliberate misconduct was intended by them to prevent an acquittal *that they believed at the time was likely to occur in the absence of the misconduct,* the trial court did find that, despite the negative impact of the cross-examination upon the People's case, the prosecutors never actually believed the case was lost. The court stated: "I don't see that it rises to a level that . . . a reasonable evaluation of the case would be that you're going to lose because of that, in the District Attorney's point of view. *Nor do I believe that they thought that.*" (Italics added.) Based upon these findings, we conclude that the prosecutors did not subjectively believe at the relevant

---

[27]We recognize, of course, that the United States Supreme Court in *Kennedy, supra,* 456 U.S. 667, attached no similar objective component to its standard barring retrial whenever the prosecution commits misconduct with the intent to produce a mistrial, and we similarly have not included such an objective component in the first (intent-to-provoke-mistrial) prong of the state constitutional standard articulated here. When the prosecution acts for the specific purpose of provoking a mistrial, and thereby intentionally and directly subverts the defendant's right not to be subjected to repeated prosecutions for the same offense, we believe that prohibiting retrial is an appropriate and proportional sanction, whether or not acquittal was a realistic prospect.

time that, absent their misconduct, an acquittal was likely to occur—and hence we need not remand for a further hearing to resolve that factual question.

Furthermore, even if the record were viewed as ambiguous on the question of the prosecutors' subjective intent, we would find no violation of defendants' state constitutional double jeopardy rights here, because we conclude that the objective component of the test is not satisfied. As explained in part III.C, *ante,* the record demonstrates that even after the defense cross-examination of Detective Branscomb (in other words, immediately prior to the misconduct that induced a successful mistrial motion), the People's case still was quite strong and, from an objective perspective, the prosecutorial misconduct did not deprive defendants of a reasonable prospect of an acquittal. It follows that the trial court did not err in denying defendants' motions to dismiss on state double jeopardy grounds.

## V

We wish to emphasize that we agree completely with the trial court's finding in the 1999 trial that the misconduct of the prosecutors during that trial was indefensible and violated defendants' due process rights to a fair trial. The proper remedy for such a due process violation was, and remains, the declaration of a mistrial, followed by a retrial. For the reasons set out above, we conclude that neither defendants' federal nor their state double jeopardy rights were violated in this case.[28]

Accordingly, the judgment of the Court of Appeal is reversed and the matter is remanded to that court for resolution of the remaining issues raised on appeal.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

[28]The Los Angeles District Attorney, appearing as amicus curiae, argues that "a jeopardy defense premised upon a prosecutor's intent presents a question of fact for the jury." In support, amicus curiae relies upon the concluding sentences of an extensive footnote in *Stone v. Superior Court, supra,* 31 Cal.3d 503. After mentioning that "[t]he determination of the validity of a claim of double jeopardy is a matter for the trial judge in the first instance," the footnote continues: "*If there is no material issue of fact, the judge rules on the double jeopardy claim. If, however, a material issue of fact exists, then it is for the jury to resolve.*" (*Id.,* at p. 509, fn. 1, italics added.)

We have grave doubts that, under the double jeopardy standard set forth above, factual questions regarding the prosecution's intent in committing misconduct are appropriate for resolution by a jury rather than by the court—as far as we are aware, *all* courts that have addressed similar double jeopardy issues have assumed that the court, rather than a jury, would make the relevant determination (see, e.g., *Kennedy, supra,* 456 U.S. 667, 675 [102 S.Ct. 2083, 2089] ["a standard that examines the intent of the prosecutor . . . merely calls for the court to make a finding of fact"]). We have no occasion to decide that issue in the present case, however, because none of the parties raised the issue in the trial court.

**MORENO, J.,** Concurring and Dissenting.—I join in the majority's holding that the double jeopardy clause of the California Constitution provides slightly broader protection than its federal counterpart. I write separately because, in my view, the Court of Appeal was correct that retrial is barred in the present case under the double jeopardy clause of the federal Constitution.

In *Oregon v. Kennedy* (1982) 456 U.S. 667 [102 S.Ct. 2083, 72 L.Ed.2d 416], the high court held that when a defendant successfully moves for a mistrial based upon prosecutorial misconduct, the double jeopardy clause of the Fifth Amendment bars a retrial only if "the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." (*Id.* at p. 679 [102 S.Ct. at p. 2091].) Despite the trial court's contrary finding, I agree with the Court of Appeal that there is no doubt the prosecutors knew their intentional misconduct would provoke a mistrial.

As the majority opinion recounts in greater detail, defendant Tracy Batts was tried in 1998 for the murder of Brian Jones in a gang-related shooting. The victim's brother, Benczeon Jones, was wounded during the attack and identified the shooters as Batts and Terrance McCrea, who had not been apprehended. Batts was convicted but was granted a new trial based upon newly discovered evidence. Prior to the retrial, Benczeon was murdered in March, 1999.

Also prior to the retrial, McCrea was apprehended. At the second trial against both defendants, Benczeon's testimony at the first trial was admitted as to Batts alone under Evidence Code section 1291, which permits the former testimony of an unavailable witness to be admitted against a party to the earlier proceeding. Benczeon's former testimony also was admitted as to both defendants under Evidence Code section 1231, which under specified circumstances allows admission of a decedent's prior statements in a gang-related prosecution if the decedent "died from other than natural causes."

Evidence Code section 1231.4 provides: "If evidence of a prior statement is introduced pursuant to this article, the jury may not be told that the declarant died from other than natural causes, but shall merely be told that the declarant is unavailable." Accordingly, the trial court instructed the attorneys on several occasions prior to and during trial that the jury would not be informed that Benczeon was dead. Instead, the jury would be told only that he was unavailable. The prosecutors were told to instruct their witnesses not to mention that Benczeon was dead.

Prosecution witness Detective Marvin Branscomb testified on cross-examination that he visited Benczeon in the hospital hours after Benczeon had

been shot and his brother had been killed. Benczeon was reluctant to cooperate with the police out of fear for the safety of his family. Detective Branscomb told Benczeon that the witness relocation program would pay the cost of the first and last month's rent if his family wished to relocate to a residence in another neighborhood. Defense counsel established that Benczeon testified on June 8, 1998 at Batts's first trial. Four months later on October 6, 1988, Detective Branscomb gave Benczeon a check for $1,500 under the witness relocation program. Cross-examination included the following exchange:

"[Defense counsel] Well, you didn't give him this money, is that correct, until October 6th, 1998, right?

"[Detective Branscomb] Yes.

"Q . . . It is after he already testified then, right?

"A Right.

"Q That is the only time he testified in connection with any of these cases, right?

"A Yes.

"Q He never showed up and testified at Tracy Batts' preliminary hearing, right? . . .

"A Correct.

"Q He didn't show up and testify in Terrance Mc Crea's first preliminary hearing. . . .

"A Correct.

"Q And he didn't testify in Terrance Mc Crea's preliminary hearing on May 10, 1988. . . .

"A Correct. [¶] . . . [¶]

"Q At the time you give him this $1500 cash he testified just one time, right?

"A Yes.

"Q And then four months after he testifies you pay him $1500 cash?

"A Yes. [¶] . . . [¶]

"Q Isn't it true that you guys gave him this $1500 as a payoff?

"A No."

On redirect examination, the prosecutor returned to the subject of the witness relocation program. After having Detective Branscomb describe how the program operates, the following exchange took place:

"[Prosecutor] . . . Before I go on, why relocate a witness?

"[Detective Branscomb] Because witnesses get murdered.

"Q Relocation has some affect upon that?

"A Yes."

A short time later, following a brief recess, the crucial exchange took place:

"[Prosecutor] . . . On May 10th, 1999, there was another preliminary hearing; is that correct?

"[Detective Branscomb] Yes.

"Q On that date, did Benczeon Jones testify? Did he testify? Simply that.

"A No.

"Q Why not?

"A He was murdered."

Defense counsel asked to approach the bench and suggested that the jury be excused for the day. After the jury had left the courtroom, the bailiff reported that one juror "broke down," saying "this is too much for her." This juror was examined outside the presence of the other jurors and said she had cried because of the "comment that was made about the death or the murder of Benczeon."

After all the jurors had left for the day, the following proceedings took place:

"The Court: . . . Now, let me ask, first of all, just preliminary of the district attorney when you asked that question, did you expect that answer?

"[Prosecutor]: Yes, your honor.

"The Court: All right.

"[Prosecutor]: The answer—I said if I ask you this question, I want you to tell the truth as to why he was not there. I said before he answered the question, make a significant pause to see if counsel wanted to object to the question. If they don't object to the question, then answer truthfully as to why it was he was not there."

When asked by the court for any other reason the information about Benczeon's death was elicited, the prosecutor stated: "[Defense counsel] opened the door and specifically implied that Benczeon did not show up and . . . that it was intentional."

Defendants moved for a mistrial and, the following day, one of the prosecutors argued that they had been forced to respond to defense counsel's implication that Benczeon had been paid for his testimony and then intentionally failed to appear to testify because "this attack essentially if accepted by the jury completely devastates any credibility that Benczeon Jones' testimony has. It destroys any credibility of this detective in testifying in this matter, and it impugns both of us as prosecutors in this case suggesting that we have not only paid the witness off in the first trial but then are taking further actions to present the jury that is perjured testimony that is bought and paid for testimony and making sure the witness isn't here." Reiterating that the detective was instructed to, and did in fact pause before answering, the prosecutor argued that defense counsel did not object because "[t]hey wanted the opportunity to ask for a mistrial."

In granting defendants' motion for mistrial, the court observed that defense counsel's cross-examination of Detective Branscomb might have given the jury the mistaken impression that Benczeon had chosen not to appear to testify, but the prosecutors easily could have addressed this problem by approaching the bench and asking the court to instruct the jury. The trial court then stated: "Now what is most perplexing of all in this analysis as I went through it for hours last night and hours this morning, I kept asking

myself one thing. Why? Why? Why on earth—why on earth would the district attorney in this circumstance not come before the court and follow that procedure? Although I painfully struggled with that question, I have absolutely no insight into that as I sit here today. None. I can't imagine that such a thing could have happened under any reasonable scenario. . . . I was shocked. I sat there stunned when I heard it. . . . I have come to the conclusion that there was reckless disregard to the rights of the defendants in posing this question under the circumstances without it being screened. . . . That is where it went wrong and irretrievably wrong, defying the order of the court, specifically defying the orders of the court."

Prior to the retrial, defendants moved to dismiss on double jeopardy grounds before the same judge that had presided over the mistrial. One of the prosecutors who had represented the People at the mistrial argued his "tactical decision" to instruct the witness to reveal that Benczeon had been murdered was a "mistake" and admitted he had acted emotionally, but asserted that causing a mistrial was "the farthest thing from [his] mind." He believed the trial had been going "extremely well" and the prosecution "had a good chance of obtaining a conviction."

The trial court denied the motion to dismiss, noting that "the case was going very well for the People." The court added: "[A]lthough as I have said their conduct was perplexing to me . . . I honestly do not believe that their conduct occurred because they wanted a mistrial. I think their conduct occurred because they let their emotions run far beyond where they should have ran. And I think they realize that."

The United States Supreme Court in *Oregon v. Kennedy, supra,* 456 U.S. 667, 676, footnote 7 [102 S.Ct. 2083, 2090], recognized that appellate courts should grant deference to a trial court's findings concerning a prosecutor's intent, stating: "It seems entirely reasonable to expect, therefore, that appellate judges will continue to defer to the judgment of trial judges who are 'on the scene' in this area, and that they will not inexorably reach the same conclusion on a cold record at the appellate stage that they might if any one of them had been sitting as a trial judge." The majority in the present case acknowledges this standard, but then erroneously relies upon two Court of Appeal decisions that apply a far more stringent standard. (Maj. opn., *ante,* at pp. 682-683.)

The court in *Barajas v. Superior Court* (1983) 149 Cal.App.3d 30, 33, footnote 4 [196 Cal.Rptr. 599], without citation to authority, admitted to "some discomfort with the trial court findings" that the prosecutor had not

intended to cause a mistrial, but held: "Nonetheless, because we are precluded from weighing the facts, we conclude substantial evidence supports the findings made by the trial court." Relying upon this footnote in *Barajas,* the court in *People v. Valenzuela-Gonzales* (1987) 195 Cal.App.3d 728, 736 [241 Cal.Rptr. 114], stated that the trial court's "findings on the issue are supported by substantial evidence, and, therefore, dispositive."

The Courts of Appeal in *Barajas* and *Valenzuela-Gonzales* misstate the standard of review established in *Oregon v. Kennedy, supra,* 456 U.S. 667, 676, footnote 7 [102 S.Ct. 2083, 2090]. As the high court held, we must defer to the trial court's findings but, as we have noted in other contexts, deference is not abdication. (*People v. Dennis* (1998) 17 Cal.4th 468, 541 [71 Cal.Rptr.2d 680, 950 P.2d 1035].)

In the present case, as the Court of Appeal correctly noted, there is no doubt the prosecutors knew their misconduct would provoke a mistrial. Several factors make this case unusual. First, the prosecutor's misconduct was deliberate and calculated. This was not a rash decision or improper question blurted out in the heat of battle. During a recess, the prosecutor instructed a police officer witness to disregard a direct court order that had been reiterated several times.

Second, the prosecutor's deliberate misconduct violated not only a direct court order, but a statute. Evidence Code section 1231.4, of which the prosecutor was aware, requires that when a decedent's statement is admitted under Evidence Code section 1231, as was Benczeon's prior testimony, "the jury may not be told that the declarant died from other than natural causes, but shall merely be told that the declarant is unavailable."

Third, it was obvious that this revelation would be a bombshell. The trial court stated it was "shocked" and "sat there stunned." A juror broke down in tears upon hearing that Benczeon had been murdered.

Finally, although the trial court concluded that the prosecutor did not intend to cause a mistrial, it admitted that it could not understand the prosecutor's intentions. Before granting the mistrial, the court questioned why the prosecutor did not approach the bench to discuss the issue, rather than instruct the witness to disobey the court order, stating: "Why? Why? Why on earth—why on earth would the district attorney in this circumstance not come before the court and follow that procedure? Although I painfully struggled with that question, I have absolutely no insight into that as I sit here today. None. I can't imagine that such a thing could have happened

under any reasonable scenario. . . ." Prior to denying the motion to dismiss, the court repeated that the prosecutor's conduct "was perplexing to me."

Under these circumstances, I have no doubt that the prosecutor intentionally violated both the trial court's order and Evidence Code section 1231.4 knowing it would provoke a mistrial. Accordingly, retrial is barred by the double jeopardy clause of the federal Constitution.

The petition of appellant Tracy L. Batts for a rehearing was denied July 30, 2003. George, C. J., and Brown, J., did not participate therein.