Filed 8/20/15  P. v. Oceguera CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JAIME OCEGUERA,<br><br>    Defendant and Appellant. | F066339<br><br>(Super. Ct. No. BF132754A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John S. Somers, Judge.

Thea Greenhalgh, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Kevin L. Quade, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## *INTRODUCTION*

Appellant Jaime Oceguera was convicted by a jury of robbery and the gang offense set forth in Penal Code[1] section 186.22, subdivision (a). The jury deadlocked on a murder charge, and Oceguera thereafter pled no contest to voluntary manslaughter. Oceguera contends his state and federal rights were violated in that his once-in-jeopardy motion to dismiss all charges was wrongly denied. He also contends the trial court erred prejudicially when it denied his motion to sever the trial on the murder charge from the robbery charges. We reject his contentions and affirm the judgment.

## *FACTS AND PROCEDURAL HISTORY*

On May 24, 2011, the Kern County District Attorney's Office filed an amended information charging Oceguera with premeditated murder, robbery, and active participation in a criminal street gang. It also was alleged that the murder and robbery were committed for the benefit of a criminal street gang and that Oceguera discharged a firearm from a motor vehicle. Leonel Reza also was charged with murder, robbery, and active participation in a criminal street gang.

On May 26, 2011, the trial court declared a mistrial on all counts. Oceguera had refused to waive his right to a speedy trial after Reza's counsel was unable to appear for the scheduled trial date because of a medical reason.

A second trial commenced and a jury was empaneled on February 2, 2012. On February 10, 2012, the trial court granted Oceguera's motion for a mistrial based upon a prosecutorial discovery violation.

Oceguera entered a once-in-jeopardy plea on February 14, 2012. The People filed opposition to Oceguera's double-jeopardy claim. The trial court denied Oceguera's request for a jury trial on the issue and rejected the once-in-jeopardy claim on September 19, 2012.

---

[1]Subsequent statutory references are to the Penal Code unless otherwise noted.

On October 19, 2012, the third jury was empaneled. On November 1, 2012, the jury returned guilty verdicts on the robbery and criminal-street-gang charges but was unable to reach a verdict on the murder charge. The jury found the gang enhancement appended to the robbery charge to be untrue. On November 1, 2012, Oceguera entered a negotiated plea of no contest to voluntary manslaughter.

In accordance with his plea agreement, Oceguera was sentenced to an aggregate term of 12 years 8 months in state prison. Various fines and fees also were imposed.

*Homicide facts*

On the night of June 14, 2010, Kern County Sheriff's deputies responded to reports of a shooting on McNew Court in Bakersfield. At the scene, deputies saw a trail of blood leading from the street to a nearby apartment complex parking lot. Blood was found on two vehicles in the parking lot. Near the street, deputies found wadding from a shotgun shell. Witnesses told the deputies that a shooting victim had been transported to a hospital in a private vehicle.

When responding to the scene, Deputy Joel Swanson observed a blue Toyota Camry speeding in the opposite direction. A passenger caught Swanson's attention by waving out the window. Swanson turned his patrol vehicle around and followed, catching up to the Camry as it arrived at Kern Medical Center. Swanson saw a male and two females pull another male into the emergency room.

Swanson spoke to the group and they told him that several Hispanic males in a green Thunderbird had shot the victim. The occupants of the Camry returned to the scene of the shooting; the interior and exterior of the vehicle were stained with blood. Deputies at the scene interviewed the driver, Whitney Hughes, and the two passengers, Daveon Jones and Shanice Hill.

The victim was 18-year-old Andre Jackson. While at the hospital, he underwent several surgeries for gunshot injuries to his face and shoulder. Jackson was diagnosed

3.

with irreversible brain damage and ultimately died on July 8, 2010.  During an autopsy, shotgun pellets were removed from Jackson's brain and left shoulder.

Ricardo Guerra stated that, on the evening of the shooting, he was socializing outside a friend's house on Cannon Avenue.  At one point, he and his friend were contacted by four Hispanic males driving a green Thunderbird.  The occupants of the Thunderbird asked Guerra his gang affiliation; he told them he had none.  The men identified themselves by street monikers and stated they were members of the Okie Bakers gang.  The front passenger was "Toker" and the driver was "Green Eyes."  Guerra saw a sawed-off shotgun and a revolver inside the Thunderbird.

The men in the Thunderbird asked Guerra if he had seen "Crackhead Carlos." Guerra indicated the direction in which he had earlier seen Carlos traveling.  The Thunderbird pulled away, and, about 10 to 15 seconds later, Guerra heard a loud gunshot.

Jones testified he met up with Jackson shortly before the shooting.  As he walked up to Jackson, a green Thunderbird rolled past, made a U-turn, and pulled up beside them.  Jones saw two men in the vehicle.  Jackson started speaking with a heavyset Hispanic male sitting in the front passenger seat.  Jones heard "this is … Okie" and then the passenger pulled out a big gun and shot Jackson.  Jackson fell backwards as the Thunderbird sped away.  Jones flagged down a car, loaded Jackson into it, and told the driver to take them to the hospital.

Hughes testified she and Hill were driving out of McNew Court late in the evening of June 14, 2010.  As they drove out, a green Thunderbird was driving in the opposite direction.  Hughes pulled over and watched as the Thunderbird made a U-turn and stopped.  Hughes saw Jackson and Jones arguing with the men in the Thunderbird, then there was a gunshot.  Jackson fell backwards and the Thunderbird sped away at about 50 miles per hour.

Jackson's girlfriend, Latasha Batiste, was in her apartment on McNew Court before the shooting.  Batiste was looking out the window and saw a green Thunderbird

4.

pull up beside Jackson and Jones. She went outside and stood by a gate that overlooks the parking lot and street. Batiste could hear Jones arguing with the Thunderbird's front passenger. After a few minutes, Batiste heard the word "Okie" and saw the passenger pull out a gun and fire. Batiste identified Oceguera as the shooter, both in a photographic line-up and in court.

Reza reached a plea agreement with the People and agreed to testify against Oceguera. Reza pled guilty to manslaughter with a gang enhancement and was sentenced to a term of 21 years in state prison. Reza testified that he and Oceguera were together on June 14, 2010. Reza's moniker was "Green Eyes" and Oceguera was known as "Toker." That evening, Reza and Oceguera were in Reza's green Thunderbird looking to buy marijuana. At one point, they stopped to speak to a person on the street and Reza introduced himself as "Green Eyes."

Reza and Oceguera made their way to McNew Court. As they turned around, two African American males jumped in front of their car. The two men claimed to be East Side Crips and asked Reza and Oceguera their gang affiliation. Oceguera began to argue and eventually pulled out a shotgun and fired at one of the men. Reza drove off. As they drove away, Oceguera, told him one of the men had a gun. Reza drove to where Oceguera had parked his truck so Oceguera could hide the shotgun. They then drove off together in the Thunderbird.

### Robbery facts

After hiding the shotgun, Reza and Oceguera were headed to a friend's house when they ran out of gas near Casa Loma Park. While waiting for friends to arrive, they were approached by German Tapia, who asked if they had any drugs to sell. Reza stated that he did and told Tapia to meet them at a nearby gas station. Reza parked his car and the three men drove around in Oceguera's truck looking for a smoking pipe.

Eventually, they parked the truck and the three men exited the vehicle and headed out into an open field. Reza hit Tapia in the back of the head and demanded Tapia give

5.

up "all [his] stuff." Tapia handed over his wallet, watch, MP3 player, bicycle, pants, shirt, hat, and shoes. Reza gave the wallet and watch to Oceguera and told Tapia to leave.

Tapia reported the robbery to law enforcement. Tapia identified Reza and Oceguera from photographic line-ups. Deputies arrested Oceguera on June 27, 2010, and searched his residence. Inside Oceguera's dresser was a black and silver watch and a gray wallet. Tapia identified the watch and wallet as items taken from him during the robbery. The MP3 player and bicycle taken from Tapia were found at Reza's residence.

*Gang evidence*

Deputy Richard Hudson testified as the People's gang expert. Based on his extensive experience, Hudson opined that the Okie Bakers were a criminal street gang whose primary activities included assaults, robberies, possession of firearms, and homicides.

Oceguera had numerous prior contacts with law enforcement; on all of these occasions, he admitted being a member of the Okie Bakers gang. He told law enforcement officers on numerous occasions that his gang moniker was "Toker." Among the tattoos on Oceguera's body were the word "Malditos" with three dots above the letter "I" on his forearm, the number "13" on his right shoulder, and the letter "O" on the back of his head.

Based upon Oceguera's prior contacts with law enforcement, Hudson opined that Oceguera was a member of the Okie Bakers gang during the shooting of Jackson and the robbery of Tapia. He also was of the opinion that both crimes were committed in connection with and for the benefit of the Okie Bakers street gang.

## *DISCUSSION*

Oceguera contends his state and federal rights were violated in that his once-in-jeopardy motion to dismiss all charges was wrongly denied. He also contends the trial

6.

court erred prejudicially when it denied his motion to sever the trial on the murder charge from the robbery charges.

## I.      *Double jeopardy*

Oceguera contends his state and federal double-jeopardy rights were violated when the trial court rejected his once-in-jeopardy plea. He contends retrial, the third trial, was barred because the mistrial at the second trial was the result of purposeful misconduct by the People. His contention lacks merit.

### A.      *Factual summary*

A second mistrial was declared on February 10, 2012. During the second trial, the People called Deputy Wilson, who testified he seized a black and silver watch during the search of Oceguera's home on June 27, 2010. When Wilson was asked to remove the watch from the evidence envelope, defense counsel asked for a sidebar. At the sidebar, Oceguera's counsel objected to the evidence on the grounds the People had failed to disclose they had physical evidence tying Oceguera to the robbery of Tapia.

Defense counsel also objected to allowing Tapia to testify that he could identify the watch because the People had only just informed the defense of their intent to elicit this testimony. Defense counsel opined that he had given an opening statement declaring there was no evidence Oceguera ever had any of the items from the robbery. The defense argued the People had intentionally committed a discovery violation.

The People responded that there had been no objection when the evidence of the stolen bike, subsequently recovered from Reza's house, was admitted into evidence the day prior, thus putting the defense on notice that the People intended to introduce the proceeds of the robbery. As for Tapia's identification of the watch, the prosecutor stated that he had not thought to ask Tapia about this until the day before and had only learned Tapia could identify the watch yesterday afternoon.

Oceguera requested exclusion from evidence of the watch and any identification by Tapia. Codefendant Reza's counsel requested a mistrial. The trial court conducted an

7.

evidentiary hearing, verifying that Tapia had only been asked the day before to identify the watch and wallet found in Oceguera's dresser.

After a brief recess, the trial court reconvened to determine whether a discovery violation had been committed. At this point, Oceguera joined in the request for a mistrial.

The prosecutor conceded that he had not informed the defense the previous afternoon of Tapia's proposed identification of the items; he had been distracted by the ongoing trial proceedings. To the extent the omission was a discovery violation, the prosecutor asserted it was not committed in bad faith. The prosecutor also argued that a mistrial was unnecessary because Tapia had already given a description of the watch and identified both defendants, testifying they both participated in the robbery.

The trial court found the People had committed a discovery violation; however, the trial court expressly stated it was not making any finding as to the prosecutor's intent. Having "the greatest reservations about it," the trial court granted the motion for mistrial. Oceguera entered a once-in-jeopardy plea four days later.

A few months later, the once-in-jeopardy claim was addressed. Defense counsel argued the discovery violation was intentionally committed by the prosecutor in order to force a mistrial because it was likely Oceguera would be acquitted on the murder charge, and the prosecutor was unhappy trying the case before separate juries and with the trial court's decisions on in limine motions.

The People asserted their prior position that a mistrial had not been warranted. The People denied having intended to cause a mistrial and disagreed with Oceguera's description of the probable outcome.

After a brief recess to consider the arguments, the trial court rejected Oceguera's once-in-jeopardy claim. The trial court noted that it had reviewed the trial transcripts of the second trial and was taking judicial notice of all pertinent records. The trial court specifically found that, although there had been a discovery violation, there was no

evidence the error was intended to trigger a mistrial or otherwise thwart a foreseen acquittal. The trial court refused to bar a retrial, and the third trial proceeded.

### B. Analysis

Our federal and state Constitutions both prohibit putting a defendant in jeopardy for the same offense more than once. (U.S. Const., 5th Amend.; Cal. Const., art. I, § 15.) Generally, when a mistrial is declared based upon a motion from a defendant, the defendant's request for a mistrial constitutes consent that waives any double jeopardy bar to retrial. (*People v. Batts* (2003) 30 Cal.4th 660, 679-680 (*Batts*).)

There is a narrow exception to the general rule under the United States Constitution, however, and that is "when a defendant has moved for a mistrial because of the prosecutor's misconduct and the mistrial motion has been granted, the *sole* basis for barring a retrial is a narrow one: retrial is barred only if the prosecutor intended by his or her misconduct to produce a mistrial." (*Batts, supra,* 30 Cal.4th at p. 681.) Under our state Constitution, when a prosecutor "intentionally and knowingly commits misconduct in order to thwart such an acquittal," retrial is barred. (*Id.* at p. 695.) It must appear objectively that an acquittal was likely to occur in the absence of misconduct. (*Id.* at p. 696.)

Oceguera contends the trial court erred under both the federal and state double-jeopardy protections when it rejected his once-in-jeopardy plea. He is incorrect.

The trial court specifically found that the prosecutor's discovery violation was not committed with the intent to cause a mistrial or because the prosecutor felt Oceguera was likely to be acquitted by the jury. Therefore, the trial court specifically found that a bar to retrial was not established under either the federal or state Constitutions. This determination is entitled to deference if supported by substantial evidence. (*Oregon v. Kennedy* (1982) 456 U.S. 667, 676; *Batts, supra,* 30 Cal.4th at p. 683.) Our review of the record discloses that substantial evidence supports the trial court's determination.

9.

The new evidence the prosecutor failed to disclose was that Tapia could identify the watch seized from Oceguera's residence as the one taken from him during the robbery. Though this proposed testimony would have provided additional evidence linking Oceguera to the robbery, there was other overwhelming evidence linking Oceguera to the robbery.

The day of the robbery, Tapia had driven around with Oceguera and Reza. Immediately before being robbed, Tapia was made by Oceguera and Reza to walk through an open field. After he was physically attacked from behind, Tapia turned and then Oceguera was "kind of like … in my face." A few days after the robbery, Tapia identified Oceguera from a photographic line-up. Tapia again identified Oceguera as one of the robbers when he testified in court. This overwhelming evidence of Oceguera's guilt on the robbery charge supports the trial court's finding that, objectively, Oceguera was not likely to be acquitted on the robbery charge, and the prosecutor did not act in the belief an acquittal was likely.

Oceguera, however, maintains that this court should *not* apply a deferential standard of review because many months had passed from the date of the mistrial to the hearing on the once-in-jeopardy claim. This contention is specious; the trial court specifically stated it had reviewed the trial transcript prior to ruling on the once-in-jeopardy plea.

Oceguera also argues that the prosecutor likely expected an acquittal after defense counsel's opening statement pointing out the lack of a connection between Oceguera and the items taken in the robbery. Defense counsel, however, never made any such statement. Defense counsel's opening statement portrayed Oceguera as a passive observer who was with Reza and simply watched as Reza robbed Tapia; no mention was made of the physical items. Regardless, the prosecutor was highly unlikely to have feared a mistrial based upon anyone's opening statement, and the argument ignores the other significant evidence of Oceguera's involvement in the robbery. Additionally, the

10.

prosecutor initially maintained that he had not committed any discovery violation and then repeatedly argued strongly against granting a mistrial, providing further evidence of the lack of any subjective intent to trigger a mistrial.

Oceguera also contends the prosecutor was trying to trigger a mistrial because of a fear of acquittal on the murder charge. First, the ability to link Oceguera to the proceeds of the robbery would have little impact on the murder charge. Second, there was independent evidence linking Oceguera to the murder such that it was unlikely the prosecutor acted to trigger an acquittal.

Batiste testified she personally observed the shooting and that the passenger in the Thunderbird pulled out a gun and shot Jackson. A week after the shooting, Batiste identified Oceguera as the shooter after looking at a photographic line-up. During the second trial, Batiste identified Oceguera in court as the man who shot Jackson. Batiste's testimony as to the events surrounding the shooting of Jackson was supported by testimony from other witnesses, including Hughes and Guerra.

In light of all the evidence produced at the second trial before a mistrial was declared, it is unlikely the prosecutor intended to cause a mistrial or thwart an acquittal, and the trial court's finding in this regard is supported by substantial evidence. As such, deference is accorded that determination. (*Oregon v. Kennedy, supra,* 456 U.S. at p. 676; *Batts, supra,* 30 Cal.4th at p. 683.)

## II. *Motion to sever*

Oceguera moved to sever the trial on the murder charge from the robbery charges prior to the start of the third and final trial.[2] The trial court denied the motion. In denying the motion to sever, the trial court found that the murder and robbery charges were part of the same class of offenses and were neither exceptionally prejudicial nor inflammatory to one another.

[2]Oceguera also had unsuccessfully moved to sever the charges prior to the first and second trials.

Oceguera contends the trial court erred prejudicially when it denied his motion to sever.

### A. Factual summary

Defense counsel argued that the shooting and the robbery were unrelated incidents with entirely different victims and that a potential self-defense claim to the murder charge would be undermined by evidence that Oceguera participated in a robbery fewer than two hours after the shooting.

The trial court rejected the defense arguments, finding the charges were of the same class and properly joined. The trial court also noted that it had heard a "considerable portion of the evidence on previous occasion[s]," and stated "that the evidence as it relates to—most of the issues [are] of relatively equal strength in terms of the two different [offenses] so I don't view this as a case where either two weak cases or weak case and a strong one are being joined to improperly create a bootstrapping effect." Additionally, the trial court found that, given the assaultive nature of the murder and robbery charges, it could not be said that the more serious murder charge was particularly inflammatory. Considering all these facts, in addition to judicial-economy considerations, the trial court found that severance was unwarranted.

### B. Analysis

Two or more different offenses may be tried together if they are "of the same class." (*People v. Stanley* (2006) 39 Cal.4th 913, 933.) Murder and robbery have been deemed to be of the same class. (*People v. Lucky* (1988) 45 Cal.3d 259, 276.) Joinder is preferred because of its efficiency. (*Stanley*, *supra*, at p. 933.) Even where joinder is permitted, however, if a defendant establishes that a substantial danger of prejudice exists from joinder, the charges should be tried separately. (*People v. Cunningham* (2001) 25 Cal.4th 926, 985.)

A trial court's denial of a motion to sever properly joined offenses is reviewed for abuse of discretion. (*People v. Soper* (2009) 45 Cal.4th 759, 774.) An abuse of

discretion is shown only if the ruling "'"'"'"'"falls outside the bounds of reason.'"'"'"'"'" (*Ibid.*)  No such showing has been made by Oceguera.

Although Oceguera contends evidence of the robbery had nothing to do with the homicide and vice versa, the trial court found that evidence pertaining to the murder and robbery charges would be cross-admissible.  Here, the trial court found that evidence from the robbery placing Oceguera and Reza in each other's company shortly after the shooting would be admissible in the murder trial as probative of connecting Oceguera to Reza and to counter Reza's version of events.  Evidence from the earlier trials placed Oceguera and Reza together in the green Thunderbird minutes after the shooting and only a short distance from where the killing occurred, which is the time when Tapia approached the two men and the robbery was thereafter committed.  When a determination has been made that evidence is cross-admissible, that fact alone is sufficient to dispel any suggestion of prejudice from joinder and justifies a trial court's refusal to sever properly joined charges. (*People v. Soper*, *supra*, 45 Cal.4th at pp. 774-775.)

In addition, both the robbery and murder charges had gang-enhancement allegations appended to them.  The allegations asserted that both the murder and the robbery were committed for the benefit of the Okie Bakers gang.  Evidence to support the gang enhancements also would be cross-admissible. (*People v. Arias* (1996) 13 Cal.4th 92, 127.)  Interests of judicial economy would support denying a motion to sever under these facts. (*People v. Earle* (2009) 172 Cal.App.4th 372, 407-408.)

The trial court, during the motion to sever, determined that the evidence of each offense was relatively equal; there was not a strong case combined with a weak case.  In fact, although Oceguera contends the evidence of the murder would tend to be inflammatory, the jury failed to convict on the murder charge.  Although the jury failed to convict on the murder charge, the trial court's assessment of the strength of the cases is supported.  Two witnesses could be expected to testify they saw Oceguera fire a gun at

13.

Jackson; one witness would be expected to testify to Oceguera's participation in the robbery, plus the proceeds of the robbery were found in his residence.

In sum, Oceguera has failed to show that the trial court's denial of his motion to sever was an abuse of the trial court's discretion.

### *DISPOSITION*

The judgment is affirmed.

_____
Smith, J.

WE CONCUR:

_____
Kane, Acting P.J.

_____
Detjen, J.